1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                         TAMPA DIVISION

3    PETER BARRETT,

4       Plaintiff,

5          vs.              CASE NO. 8:09-CV-2485-T-27
                            12 SEPTEMBER 2013
6                           TAMPA, FLORIDA
                            1:35 - 3:50 PM
7                           PAGES 1 - 108

8    SECRETARY, DEPARTMENT OF CORRECTIONS,

9       Defendant.
     _____/
10
                    TRANSCRIPT OF EVIDENTIARY HEARING
11            BEFORE THE HONORABLE JAMES D. WHITTEMORE
                    UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
     For the Plaintiff:    **A. Fitzgerald Hall**
14                         Federal Public Defender's Office
                           Middle District of Florida
15                         400 N. Tampa Street, Suite 2700
                           Tampa, Florida 33602
16
     For the Defendant:    **Elba Caridad Martin-Schomaker**
17                         **Timothy A. Freeland**
                           Office of the Attorney General
18                         Suite 200
                           3507 E. Frontage Road
19                         Tampa, Florida 33607-7013

20   Also present:         Peter Barrett

21   Court Reporter:       Linda Starr, RPR
                           Official Court Reporter
22                         801 N. Florida Avenue
                           Suite 13B
23                         Tampa, Florida 33602

24   Proceedings recorded and transcribed by computer-aided
     stenography.
25

1                          I N D E X

2    Witness Name                              Page Number

3    Testimony of Peter Alexander Barrett
         Direct Examination by Mr. Hall:            7
4        Cross Examination by Mr. Freeland:        29

5    Testimony of Mark Lewis:
         Direct Examination by Mr. Freeland:       31
6        Cross Examination by Mr. Hall:            33

7    Testimony of Deborah Goins:
         Direct Examination by Mr. Freeland:       37
8        Cross Examination by Mr. Hall:            58
         Redirect Examination by Mr. Freeland:     89
9        Recross Examination by Mr. Hall:          91

10

11                       * * * * * * * *

12                       E X H I B I T S

13   Petitioner's Exhibit Number 1-B               22
     Petitioner's Exhibit Number 2                 75
14   Petitioner's Exhibit Number 3                 74

15

16

17

18

19

20

21

22

23

24

25

1          COURTROOM SECURITY OFFICER:  All rise.  This

2    Honorable Court is now in session, The Honorable Judge

3    James D. Whittemore presiding.

4          Please be seated.

5                  **P R O C E E D I N G S**

6          THE COURT:  Good afternoon.

7          We are here for an evidentiary hearing in a

8    habeas matter, Barrett versus Secretary, Case Number

9    09-CV-2485.

10          First let's get the appearances on the record.

11    For the petitioner?

12          MR. HALL:  Good afternoon.  Alec Hall on behalf

13    of Mr. Peter Barrett.

14          THE COURT:  Good afternoon.  And for the

15    respondent?

16          MR. FREELAND:  Timothy Freeland.

17          MS. MARTIN-SCHOMAKER:  Elba Martin-Schomaker.

18          THE COURT:  I'm sorry.  What was your last

19    name, sir?

20          MR. FREELAND:  Freeland, Your honor.

21          THE COURT:  Spell that for me.

22          MR. FREELAND:  F-r-e-e-l-a-n-d.

23          THE COURT:  Just like it sounds.

24          MR. FREELAND:  Yes, sir.

25          THE COURT:  Thank you.  I just didn't hear

1   you.  Thank you.

2            There was filed a motion for

3   reconsideration -- Anne, let's get the door fixed,

4   please -- which is Docket 24, in which the respondent

5   sought reconsideration of the order which brings us here

6   today.  That motion is denied.  A written order will be

7   forthcoming.

8            I appreciate the -- not only the effort and

9   the motion, but the response by Mr. Hall on behalf of

10  Mr. Barrett, as well.

11           The sum and substance of my ruling is simply

12  that, while there is a presumption that the state court

13  made a determination and adjudication on the merits,

14  even where there is a summary order without any

15  reference to the claim, in this case the record

16  demonstrates an explanation other than an adjudication

17  on the merits.

18           In other words, there was no adjudication on

19  the merits.  And the presumption, to the extent it

20  applies, is plainly rebutted by the record.  There was

21  no evidentiary hearing on this particular claim in the

22  state court, so there could not have been a

23  determination under *Strickland v. Washington* as to

24  whether counsel's inaction was deficient performance or,

25  for that matter, if so, whether petitioner was

1    prejudiced, because the very statements that he

2    complained should have been used by counsel are not in

3    the record.  Accordingly, the state court could not have

4    made an adjudication, could not have applied *Strickland*,

5    because there was nothing to -- in the record to which

6    the *Strickland* standard could have been applied.

7            As I read *Johnson* and *Richter*, this is -- the

8    presumption is not absolute, but may be rebutted by

9    explanations other than an adjudication.  Unlike those

10   cases, we don't have a state court order that -- a

11   silent state court order that rejects a claim based on a

12   record that refutes the claim.  We have the absence of a

13   record, so there could not have been an adjudication.

14           In fact, Judge Black's order denying the

15   petitioner's motion for rehearing -- at the time Judge

16   Black was a state court circuit judge -- referenced the

17   adequate -- in his words, "The court finds that its

18   previous order adequately addressed defendant's

19   allegations."

20           I cannot tell what Judge Black was referring

21   to because the prior order did not address the

22   allegations.  So there could not have been an adequate

23   addressment of those allegations, for the reason I've

24   stated.

25           So in any event, again, I appreciate counsel's

1   discussion of *Johnson* and *Richter*.  And at first glance,

2   it certainly got my attention.

3          But we are ready to proceed.  We are

4   proceeding solely on the second part of petitioner's

5   claim of ineffective assistance set forth in ground

6   three.

7          Mr. Hall, you may proceed.

8          MR. HALL:  Judge, with the Court's permission,

9   I'd like to call Mr. Barrett.

10          THE COURT:  All right.

11          He can testify from right there.  Just stand

12   and be sworn, please.

13          COURTROOM DEPUTY CLERK:  Please stand and

14   raise your right hand.

15          Do you swear or affirm the testimony that you

16   give in this case will be the truth, the whole truth and

17   nothing but the truth?

18          THE WITNESS:  Yes, I do.

19          COURTROOM DEPUTY CLERK:  Thank you.  Please be

20   seated.

21          (Witness complies.)

22          COURTROOM DEPUTY CLERK:  State your name and

23   spell your last name for the record.

24          THE WITNESS:  Peter Alexander Barrett.  Last

25   name is spelled B-a-r-r-e-t-t.

```
1              COURTROOM DEPUTY CLERK:  Thank you.
2              MR. HALL:  If I may?
3              THE COURT:  Yes, sir.
4                     DIRECT EXAMINATION
5    BY MR. HALL:
6         Q.    Sir, currently where do you live?
7         A.    I reside at Hardy --
8              THE COURT:  Just pull that mic a little closer
9    to you.
10             THE WITNESS:  Okay.  I live at Hardy
11   Correctional Institution in Bowling Green, Florida.
12   BY MR. HALL:
13        Q.    Okay.  Is that a state prison?
14        A.    Yes, it is.
15        Q.    Okay.  And you're currently incarcerated?
16        A.    Yes, I am.
17        Q.    Okay.  And in this matter, you've filed a
18   petition under 2254; is that correct?
19        A.    Yes, I have.
20        Q.    Okay.  And is that as a result of you being
21   convicted in state court?
22        A.    Yes, it was.
23        Q.    Can you tell Judge Whittemore what county was
24   that in?
25        A.    Hillsborough County.
```

1     Q.     Okay.  Can you tell Judge Whittemore what that

2   offense was for?

3     A.     First degree, premeditated murder.

4     Q.     Now, in this particular matter, this involved

5   you and an incident between another individual?

6     A.     Yes, it did.

7     Q.     Okay.  And what is that person's name?

8     A.     Kenneth Gonzalez.

9     Q.     Did you proceed to trial in this matter in

10  state court here in Hillsborough County?

11    A.     Yes, I did.

12    Q.     And were you -- what was the result of that?

13    A.     I was convicted of first degree, premeditated

14  murder.

15    Q.     Okay.  And what were you sentenced to?

16    A.     Life without the possibility of parole.

17    Q.     Now, you're testifying today and you're under

18  oath.  Are you -- can you give us your assurance you're

19  going to tell the truth in this matter?

20    A.     Yes, I will.

21    Q.     Did you -- you indicated to us that you

22  proceeded to trial in state court; is that correct?

23    A.     Yes, I did.

24    Q.     Okay.  And did you have an attorney?

25    A.     Yes, I did.

1    Q.    Can you tell Judge Whittemore the attorney's

2    name?

3    A.    Deborah A. Goins was lead counsel.  Harvey

4    Hyman sat in as second chair.

5    Q.    Now, can you tell the Court the date this event

6    happened resulting in the death of Mr. Gonzalez, if you

7    recall?

8    A.    February 2nd, 2001.

9    Q.    And can you briefly describe to Judge

10   Whittemore -- on the night the incident occurred, can

11   you explain to Judge Whittemore what happened and the

12   events leading up to the death of Mr. Gonzalez?

13   A.    How far back should I --

14   Q.    Well, we just want to know the night in

15   question.

16   A.    Okay.  I had came home from work, arriving

17   about 12:00 AM, roughly.  And Mr. Gonzalez came in after

18   me.  He was already intoxicated.  And we got into an

19   argument later in the night.  The argument escalated.

20   And I'm sorry if I don't remember all -- all the

21   details.  You know, it's been quite -- quite some time

22   ago.

23   Q.    Well, let me ask you this.  Was this -- whose

24   residence were you at on this particular night or

25   morning?

1    A.    I was at my duplex.

2    Q.    Okay.  Were you leasing the property?

3    A.    I was renting a room from one of the persons

4    that was leasing the property.

5    Q.    And how did Mr. Gonzalez come to reside at this

6    particular residence?

7    A.    Well, I had initially invited him to stay

8    there.

9    Q.    Okay.  Were the two of you in a relationship at

10   all?

11   A.    We were friends, but we were not in any type of

12   sexual relationship.

13   Q.    All right.  Now, in -- just so the record is

14   clear, you told us the name of Mr. Gonzalez.  Can you

15   tell the Court, when did you first meet Mr. Gonzalez?

16   A.    December 26th, 2000.

17   Q.    Okay.  Can you describe Mr. Gonzalez to the

18   Court.

19   A.    He's about 35 years old, six-foot-one, 245

20   pounds.  A fairly large person.

21         MR. HALL:  Judge, can I just have him stand

22   just so the Court can see his --

23         THE COURT:  Yes, sir.

24   BY MR. HALL:

25   Q.    Can you stand for us, please.

1    A.    (Witness complies.)

2    Q.    And can you describe your height and weight to

3  the Court, please?

4    A.    About five-six, five-seven, 140 pounds.

5    Q.    Back in December of 2001, were you about the

6  same size or were you larger, shorter?

7    A.    About the same size.

8    Q.    About how much did you weigh then?

9    A.    One forty.

10    Q.    Okay.  Now, on the night in question, you were

11  saying that you came home about 12:00 in the morning,

12  12:30 or so?

13    A.    Yes.

14    Q.    And you indicated to the Court that there was

15  an argument that took place between you and

16  Mr. Gonzalez?

17    A.    It was an escalating argument, and it ended up

18  in a lot of -- some pushing.  I think -- at one point I

19  think he kicked my dog, and we were just pushing each

20  other.  He threatened to -- I'll use the word -- he was

21  going to beat my ass.

22    Q.    That's what he told you?

23    A.    Yes.

24    Q.    And what did you understand that statement to

25  mean to you?

1    A.    That he was going to hurt me.

2    Q.    Okay.  And at some point did an altercation

3  take place?

4    A.    Well, I broke away from him.

5    Q.    Okay.  And when you say you "broke away," tell

6  the Court what happened.

7    A.    I retreated to my bedroom.

8    Q.    Okay.

9    A.    He followed.

10   Q.    Now, at this point when you left Mr. Gonzalez,

11 were you still in your residence?

12   A.    Yes.

13   Q.    Okay.  And you say you went to your bedroom?

14   A.    Yes.

15   Q.    Okay.  And what did Mr. Gonzalez do?

16   A.    He came into my bedroom, and I got a bat from

17 underneath my bed.

18   Q.    Okay.  Now, when you first went into your

19 bedroom, you indicated that you retrieved a bat?

20         MR. FREELAND:  Your Honor, may I object to the

21 relevance of all this?  We're really not here to retry

22 the case.  We're really only here on --

23         THE COURT:  I understand.  I understand.

24         Mr. Hall, what's the relevance?

25         MR. HALL:  Okay.  Well, I can just fast forward

1  ahead, then, Judge.

2          THE COURT:  Well, I think we just need to zero

3  in on the issue that is raised in Ground 3(2), the

4  failure to use the statements.

5          MR. HALL:  Okay.

6          THE COURT:  I've read the record.  I know the

7  background and the trial, the basis for the conviction

8  and what occurred.  And let's zero in on that issue, if

9  we can.

10          MR. HALL:  Okay.

11  BY MR. HALL:

12     Q.    At the trial in this matter, did you have an

13  opportunity to meet with Ms. Goins?

14     A.    Yes.

15     Q.    Can you tell Judge Whittemore what was the

16  defense at trial?

17     A.    We were proceeding on basically an imperfect

18  self defense.

19     Q.    Let me ask you this.  Did you testify at trial?

20     A.    Yes, I did.

21     Q.    Okay.  And you had previously met with Ms.

22  Goins before you testified?

23     A.    Yes, I have.

24     Q.    And can you tell the Court whether or not you

25  had been interviewed by the Tampa Police Department?

1    A.    I was interviewed.  I gave three statements to

2  the Tampa Police Department.

3    Q.    Do you remember who you gave statements to?

4    A.    Detective Rockhill, Detective Holland and

5  Detective Simonson.

6    Q.    Okay.  Now, at some point did Ms. Goins ask

7  questions of you on direct examination?

8    A.    Yes, she did.

9    Q.    And did there come a time when you were

10  cross-examined by the state attorney?

11    A.    Yes, I was.

12    Q.    Do you remember what that state attorney's name

13  was?

14    A.    There was two.

15    Q.    Well, the one that asked you questions.

16    A.    I believe it was primarily Shirley Ross.

17    Q.    Okay.  On cross-examination, did the state

18  attorney attempt to impeach you, as best you recall?

19    A.    Yes, they did.

20    Q.    Okay.  Do you remember what those particular

21  inconsistencies or impeachment was?

22    A.    May I refer to my 3.850?

23        THE COURT:  Yes, sir, you may.

24        MR. HALL:  Judge Whittemore, he's shackled.

25  His hands are shackled.  Is it possible to have just the

1   handcuffs removed?

2           THE COURT:  I don't have a problem with it.

3   It's up to the deputies who are here and in whose

4   custody he remains.

5           MR. HALL:  Judge, they were waiting to hear

6   from the Court, with the Court's permission.

7           THE COURT:  All right.  That's fine.  Just the

8   hands?

9           MR. HALL:  Yes, sir.  He's shackled at the

10  feet.

11          THE COURT:  Mr. Freeland or Ms.

12  Martin-Schomaker, we do have the transcript of the trial

13  in the record; do we not?

14          MS. MARTIN-SCHOMAKER:  Yes.  It was filed with

15  the original.

16          MR. FREELAND:  Yes, Your Honor.  I'm sorry.

17  I'm sorry.  Yes, Your Honor, it is present.

18          THE COURT:  Well, you can just paraphrase,

19  Mr. Barrett, is my point.  We have the record, so the

20  specifics of the impeachment or cross-examination are in

21  the record.

22          THE WITNESS:  Yes, they are.

23          THE COURT:  Well, you can testify to the best

24  of your recollection.  Obviously, the record is going to

25  determine or establish what exactly occurred in the

1  trial.

2          THE WITNESS:  I will try.  My recollection at

3  this point is just not -- not as good as it used to be,

4  so that's why I'm trying to refer to it.

5          THE COURT:  You can refresh your memory.

6  That's fine.

7          MR. FREELAND:  Your Honor, if I may, we did

8  agree before this hearing that there are really only

9  four issues relating to his impeachment that we are here

10  to address which, you know, would include the issue of

11  the window being broken, the issue of the cigarette

12  burn, when he exactly told law enforcement that the

13  cigarette burn occurred, the victim's approaching his

14  bedroom door in the manner -- whether he lunged at him

15  or entered his bedroom, and when he told law enforcement

16  that the -- about the Bible, his use of the Bible to --

17  with the victim.

18          So there's really only four that I'm aware of

19  that we're here to deal with.  If they could focus on

20  those, then we could proceed.

21          THE COURT:  Well, I don't want to restrict

22  unduly the presentation of the evidence, so I'm going to

23  let you proceed, Mr. Hall.

24          But, again, the issue before me is the

25  contention that counsel was ineffective in not using the

1   prior consistent statements to rebut the testimony of

2   the detectives.

3          MR. HALL:  Yes, sir.  And with the statement by

4   Mr. Freeland, those are the issues that I would bring

5   out, Judge.  And we can stipulate to those and move on,

6   if it's the --

7          THE COURT:  Well, if you need to lay some

8   background, that's fine.  It could be helpful.  Go

9   ahead.

10         MR. HALL:  All right.

11  BY MR. HALL:

12    Q.    Okay.  Mr. Freeland, if you can go ahead and

13  bring up as best you recall the inconsistent statements

14  that the prosecutor elicited from you on

15  cross-examination.

16    A.    There were actually a total of six that were

17  brought out.  There was the issue of the broken window

18  and the fact that -- well, Detective Rockhill saying

19  that I -- somebody had actually broken into my house and

20  taken the VCR.  And I denied that statement to him.

21  That was one of the inconsistencies.

22         And in my pleading, I talked about that being a

23  collateral matter.

24    Q.    What's the second inconsistency?

25    A.    The second inconsistency is the timing of the

1    cigarette burn.  I told -- I told -- Detective Rockhill

2    claimed that I told him it happened in late December.

3    Actually, that actually occurred in January right after

4    the Super Bowl.

5           The third one was when I had mentioned the

6    Bible in the box.  The fourth one was about whether I

7    told him the -- that -- whether I told him that Kenneth

8    had lunged at me in the room.  And I said that, you

9    know, and he didn't.

10          The fifth inconsistency is talking about --

11   well, it's not really an inconsistency about whether --

12   about building up anger.  There really isn't any

13   inconsistency there.  And then about standing, you know,

14   whether I was standing in the doorway or whether --

15   whether -- whether Kenneth was standing in the doorway

16   or whether he was near the door.

17   Q.    Now, the state elicited that statement from

18   you; is that correct?

19   A.    On cross-examination.

20   Q.    Okay.  And at some point, the state completed

21   his cross-examination of you; is that correct?

22   A.    Yes.

23   Q.    And did Ms. Goins get an opportunity to

24   redirect or ask questions of you again?

25   A.    I believe she might have.  She may have did

1   some on redirect.  I don't recall.

2       Q.    Now, in her questioning of you, do you ever

3   recall her trying to, quote, unquote, rehabilitate you

4   to rebut any inconsistencies that the state may have

5   brought out on its cross-examination of you?

6       A.    I don't recall.

7       Q.    For example, when did you receive the cigarette

8   burn on your hand; did she bring out any of those

9   statements during trial?

10      A.    Well, I testified on direct that it occurred in

11  January.

12      Q.    Well, I understand that.  But on her redirect

13  of you, did she -- are you familiar with the term

14  "rehabilitation"?

15      A.    Yes.

16      Q.    Are you a law clerk at the Hardy County --

17      A.    Yes, I am.

18      Q.    -- Correctional Prison?

19      A.    Yes, I am.

20      Q.    How long have you been a law clerk?

21      A.    About 12 -- well, I got certified in 2003.

22      Q.    All right.

23            And you're familiar with the term

24  "rehabilitation"?

25      A.    Yes, I am.

1    Q.    Okay.  Having reviewed your case, can you tell

2  the Court whether or not Ms. Goins ever tried to

3  rehabilitate you --

4    A.    Are you referring --

5    Q.    -- with the inconsistencies that were brought

6  out?

7    A.    Are you referring to the fact that after

8  Detective Rockhill had testified on rebuttal?

9    Q.    Yes, sir.

10    A.    Let me just -- I guess the best way to explain

11  this is I was cross-examined by -- on cross-examination

12  by the prosecutor regarding some alleged inconsistent

13  statements that I made.

14          After that, you know, there was a discussion

15  and we talked about that they knew that the state was

16  going to put on Detective Rockhill to impeach my trial

17  testimony.

18    Q.    Well, let me stop you.  Let me ask you this.

19  Let me do this.

20          Did Detective Rockhill testify in the state's

21  rebuttal case?

22    A.    Yes, he did.

23    Q.    Okay.  Did the prosecution bring out alleged

24  inconsistent statements that you supposedly made during

25  trial?

1     A.     Through Detective Rockhill.

2     Q.     Okay.  Did Ms. Goins get an opportunity to

3  cross or ask questions of Detective Rockhill?

4     A.     Yes, she did.

5     Q.     Did she ever try to bring out consistent

6  statements or rebut any inconsistent statements that the

7  state was saying that you had testified to?

8     A.     She did not try to rehabilitate me through --

9  by introducing my prior consistent statements.

10    Q.     When you say your prior consistent statements,

11  what prior consistent statements are you referring to?

12    A.     Those would be my police statements.

13    Q.     And who took those police statements?

14    A.     Detective Rockhill, Detective Holland and

15  Detective Simonson.

16           MR. HALL:  Judge, at this time I would like to

17  offer into evidence what's been marked for

18  identification as Petitioner's Exhibit 1-B.

19           THE COURT:  Are you offering it at this time?

20           MR. HALL:  Yes, sir, I am.

21           THE COURT:  Is there any objection?

22           MR. FREELAND:  1-B would be -- if you could

23  please explain which --

24           THE COURT:  It's the statements.  There's an

25  exhibit list.

1          MR. FREELAND:  Oh, right.  Thank you.  Yes.

2     No objection to that.

3          THE COURT:  All right.  1-B is received for

4     purposes of this hearing.

5          (Whereupon, Petitioner's Exhibit Number 1-B is

6     received into evidence.)

7     BY MR. HALL:

8     Q.    Now, as you sit here today, have you not --

9     have you had an opportunity to review the statements

10    that Detective Rockhill took from you on the night of

11    your arrest?

12    A.    Yes, I have.

13    Q.    Okay.  And having reviewed those statements, is

14    there anything in that report that is inconsistent with

15    your testimony that you've provided during trial?

16    A.    There -- there were -- I'm going to say there

17    were two significant omissions.  Okay.  One of it was I

18    did not mention that I had struck my bedroom door when I

19    got away from Kenneth Gonzalez.  And I didn't -- that I

20    did not mention to -- in the initial -- Ms. Goins

21    brought that out during my direct examination as a form

22    of --

23         MR. FREELAND:  Your Honor, if I may, I would

24    object to his testimony because the -- it's not

25    responsive to the question.  The question is were there

1   inconsistencies, and he's talking about omissions, which

2   is not an inconsistency.

3           THE COURT:  Overruled.  I'll allow him to

4   testify.

5   BY MR. HALL:

6       Q.    Let's zero in on the inconsistent statements

7   you've talked about.

8           When you look at Detective Rockhill's report,

9   after reviewing the report, are you able to determine

10  any inconsistencies in the report that the state

11  elicited of you?

12      A.    I didn't see anything significantly that was

13  inconsistent.  I -- like I said, there were a couple

14  omissions.  Can that be considered inconsistency?  I

15  don't know.  I mean, that's --

16      Q.    Well, since you mentioned two omissions, what

17  specific omissions are you referring to?

18      A.    One was I did not mention to Detective Rockhill

19  that I had struck the bedroom door as a warning shot

20  prior to -- before Kenneth came in my room.

21      Q.    Well, you say you didn't mention it, but let me

22  ask you this.  Did Detective Rockhill ask you the

23  question?

24      A.    No, he didn't ask me.

25      Q.    All right.

1          And what's the second omission that you're

2   bringing to the Court's attention?

3      A.    That Mr. Gonzalez had lunged at me.

4      Q.    Okay.  All right.

5          Did Detective Rockhill ask you that question,

6   "did he lunge at you"?

7      A.    No, he didn't.

8      Q.    Now, this police report by Detective Rockhill

9   that's in evidence now, Petitioner's Exhibit 1-B, when

10   was the first time you saw this report?

11      A.    A couple weeks after I got arrested.

12      Q.    Okay.  And did you have a chance to review it

13   with Ms. Goins?

14      A.    Yes, we did.

15      Q.    Okay.  And did you all talk about the

16   importance of this report?

17      A.    We had several discussions about my -- using my

18   police reports.  I know that in her progress notes of

19   August 3rd, we -- she mentioned talking about my police

20   statements.  And I was making -- I know she said she was

21   making the point that it was good evidence for me.

22      Q.    Did she explain how it would be good evidence

23   for you?

24      A.    We were going to use it to corroborate my

25   testimony at trial.

1    Q.    Did there ever come a time when Ms. Goins tried

2  to introduce this police report into evidence?

3    A.    Yes, she did.

4    Q.    Okay.  What was the result of her attempt to do

5  that?

6    A.    There was a hearsay objection by the

7  prosecuting (sic), and it was sustained by the Court.

8    Q.    Okay.  After Detective Rockhill testified at

9  trial, was there ever another -- was there ever -- did

10  Ms. Goins ever try to reintroduce this police report

11  into evidence?

12    A.    No, she did not.

13    Q.    Are you familiar with the term "proffer" or

14  "offer of proof"?

15    A.    Yes.

16    Q.    Did Ms. Goins ever offer or proffer the police

17  report of Detective Rockhill into evidence?

18    A.    No, she didn't.

19        MR. HALL:  May I just have a minute, Judge

20  Whittemore?

21        THE COURT:  Yes, sir.

22        (Brief pause.)

23  BY MR. HALL:

24    Q.    All right.

25        I was asking you about Detective Rockhill's

1   report, Petitioner's Exhibit 1-B.  Did you and Ms. Goins

2   ever talk about why she wanted to try to get this report

3   into evidence?

4     A.    Well, there was one point when Ms. Goins had

5   talked about filing a motion to suppress my police

6   statements on the basis of intoxication.  And I had

7   asked her, I said, "Well, what would be the reason?"

8         And we talked about how -- actually, that the

9   statements were beneficial to me.  And as a matter of

10  fact, I recall Ms. Goins saying that they're the best

11  evidence going for you, and the fact that she was going

12  to try to introduce -- we talked about introducing my

13  police statements prior to my testimony in order to

14  corroborate my trial testimony.

15        In my case, you know, it is a murder case and,

16  you know, unfortunately, you know, I -- there's been a

17  lot of grief over this, you know.  I'm really -- I'm

18  tore up every day about this, you know.  I --

19    Q.    What's your point?

20    A.    The point is I'm -- I'm the only witness to

21  really what -- what -- the events of the night.

22    Q.    Okay.

23    A.    And she felt that it was important that -- to

24  my defense.  And we weren't pursuing a self defense.  We

25  were just trying to pursue a defense where at least, you

1    know, an acquittal on the premeditated murder.  And I

2    was hoping myself that I would just be convicted of

3    second degree murder or possibly manslaughter.

4        Q.    All right.

5             Let me ask you this.  I'm going to ask you to

6    look at Petitioner's Exhibit 1-B.  I believe you have a

7    copy.  And if you could look at page 24 of 52 as

8    reflected in the document.

9        A.    Twenty-four.

10       Q.    If you can look at page 24 of 52 as reflected

11   in Petitioner's Exhibit 1-B.

12       A.    Page 24.  Okay.

13       Q.    Do you see the top of that page, the sentence

14   that begins "the defendant stated"?

15       A.    Yes.

16       Q.    Okay.  Does this reflect when you met

17   Mr. Gonzalez?

18       A.    Yes, it does.

19       Q.    Okay.  And what date was that, according to

20   this document?

21       A.    December 26th, 2000.

22       Q.    When you skip down several lines where the

23   sentence begins "some weeks later," do you see that?

24       A.    Let's see.  What have we got.  Some weeks

25   later.  Okay.  Yeah.  I see that now.  Okay.

1    Q.    Do you see that?

2    A.    Yes.

3    Q.    Some weeks later in mid December, some weeks

4    later approximately mid December, is that an accurate --

5    is that accurate as to what you told Detective Rockhill?

6    A.    No, it's not.

7    Q.    If some weeks later -- looking at when you

8    first met Mr. Gonzalez, December 26th, some weeks later

9    would put you into what timeframe?  Can you tell Judge

10   Whittemore when that would be?

11   A.    January 2001.

12   Q.    And is that consistent with what happened as

13   opposed to what Detective Rockhill wrote in his report?

14   A.    Yes, it was.

15   Q.    If you would go down to the sentence that also

16   says "the defendant stated this type of behavior."  Do

17   you see that?

18   A.    Yes.

19   Q.    Okay.  And there was some testimony regarding

20   when you received the cigarette burn by the decedent,

21   Mr. Gonzalez?

22   A.    Yes.

23   Q.    Okay.  And in Detective Rockhill's report, he

24   indicates that was in late December?

25   A.    That's correct.  He states "sometime in late

1  December."

2      Q.     Is that -- is that accurate as to what you told

3  Detective Rockhill?

4      A.     No, it is not.

5      Q.     And some weeks later would have been what

6  timeframe when you received a burn on your hand from the

7  decedent?

8      A.     It would have been in January.

9      Q.     And not as reflected by Detective Rockhill's

10  report?

11     A.     That's correct.

12     Q.     So this report is inaccurate?

13     A.     Yes, it is.  To that extent, yes.

14            MR. HALL:  We have no further questions of him,

15  Judge Whittemore.

16            THE COURT:  Cross-examination, Mr. Freeland.

17            MR. FREELAND:  Thank you, Your Honor.

18                      CROSS-EXAMINATION

19  BY MR. FREELAND:

20     Q.     So your position today is that this police

21  report from Detective Rockhill is not inconsistent with

22  your trial testimony?

23     A.     That is correct.

24            MR. FREELAND:  No further questions.

25            THE COURT:  Any redirect?

1            MR. HALL:  Nothing further of him, Judge.

2    Thank you.

3            THE COURT:  All right.

4            Call your next witness, please.

5            MR. HALL:  Judge, we don't have any other

6    witnesses.

7            THE COURT:  All right.

8            What says the respondent?

9            MR. FREELAND:  I would move for summary

10   judgment at this point, Your Honor.  They have not

11   established --

12           THE COURT:  I'm going to deny summary

13   judgment.  It's not a matter of resolving factual

14   disputes.

15           MR. FREELAND:  I would make a -- we would

16   call -- we would call Mark Lewis.

17           THE COURT:  I'm sorry.  I just didn't hear

18   you.

19           MR. FREELAND:  We would call Mark Lewis.

20           THE COURT:  Mr. Lewis, come forward, please.

21           COURTROOM DEPUTY CLERK:  Please raise your

22   right hand.

23           (Witness complies.)

24           COURTROOM DEPUTY CLERK:  Do you swear or

25   affirm the testimony that you give in this case will be

1    the truth, the whole truth and nothing but the truth?

2            THE WITNESS:  I do.

3            COURTROOM DEPUTY CLERK:  Please be seated.

4            (Witness complies.)

5            COURTROOM DEPUTY CLERK:  Please state your

6    name and spell your last name for the record.

7            THE WITNESS:  Mark -- excuse me -- Mark Lewis.

8    L-e-w-i-s.

9                    DIRECT EXAMINATION

10   BY MR. FREELAND:

11      Q.    Mr. Lewis, can you please tell the Court what

12   your occupation is.

13      A.    I'm retired.

14      Q.    Prior to being retired -- where are you retired

15   from?

16      A.    I retired from the State Attorney's Office,

17   Hillsborough County.

18      Q.    Were you involved in any respect with

19   Mr. Barrett's case?

20      A.    I represented the state in the post conviction

21   relief hearing.

22      Q.    How long have you been an attorney?

23      A.    I was admitted in November 1976.  I started

24   practicing in around April of 1977.

25      Q.    All right.

1          In the course of your professional business as

2    an attorney and as a prosecutor, did you have occasion

3    to educate other attorneys involving any CLE, continuing

4    legal education, things of that sort?

5    A.     For a number of years I served on the Education

6    Committee of the Florida Prosecuting Attorneys

7    Association.  I was chair for, I believe, two years.

8          I also have lectured both in the office and to

9    the FPAA on various criminal matters.

10   Q.     Now, with regard to Mr. Barrett's case, you're

11   aware that one of the issues here has to do with whether

12   the police reports should have been admitted in his

13   case?

14   A.     Yes.

15   Q.     Are you familiar with the First District's case

16   of *Munday*, the *Munday* case?

17   A.     Yes.

18   Q.     Decided by the Court here?

19   A.     Yes, I am.

20   Q.     If the defense in this -- if the defense had

21   moved to introduce the police reports, as a prosecutor

22   would you have objected to that?

23   A.     Yes.

24   Q.     On what grounds?

25   A.     My understanding that they were being

1   introduced as prior consistent statements, which are

2   generally inadmissible except under limited

3   circumstances.

4       Q.   Now, have you reviewed the *Munday* case, and how

5   does that apply here?

6       A.   I reviewed the *Munday* case, and I also looked

7   at one of the editions of Ehrhardt's Florida Evidence,

8   which is considered the Bible, I guess, for evidence in

9   the State of Florida.  And *Munday* is relegated to a

10  footnote which seems to be -- as I interpret it, as an

11  aberration and not in keeping with the statute.

12          MR. FREELAND:  I don't have any other

13  questions at this point, Your Honor, then.

14          THE COURT:  Cross-examination, Mr. Hall.

15                  CROSS-EXAMINATION

16  BY MR. HALL:

17      Q.   I'm sorry.  Is it Attorney Lewis?

18      A.   Yes.

19      Q.   Okay.  And back in 2001, you were working for

20  who?

21      A.   The State Attorney, 13th Judicial Circuit.

22      Q.   Okay.  And you've indicated to the Court that

23  you've read the *Munday* case?

24      A.   Yes.

25      Q.   And other than the *Munday* case, you're familiar

1  with rehabilitation?

2      A.     I'm sorry?

3      Q.     You're familiar with the term "rehabilitation"

4  in trial practice?

5      A.     That's what the *Munday* case said, yes.

6      Q.     Okay.  I understand *Munday*, but you're familiar

7  with rehabilitation in trial practice?

8      A.     You mean what the term means?

9      Q.     Yes, sir.

10     A.     Yes, sir.

11     Q.     Okay.  And you're aware that once an individual

12 has been impeached with some type of inconsistency, a

13 prior consistent statement is admissible or can be

14 admitted into court?

15     A.     Well, according to the statute, and I believe

16 it's 90.801, but I get fuzzy on those, there's limited

17 circumstances for prior consistent statements to be

18 admitted.

19            I think it's motive, improper influence and

20 recent fabrication.  That has to be specified or implied

21 before that -- those would be admissible.

22     Q.     Were you the trial -- were you representing the

23 state or were you prosecuting -- did you prosecute

24 Mr. Barrett in this case?

25     A.     No, I didn't.

1    Q.    Okay.  And you weren't even present; is that

2    true?

3    A.    No.

4    Q.    Okay.  So you don't know what the trial

5    procedure was other than what you read; isn't that true?

6    A.    I was not there.  That's correct.

7    Q.    Okay.  Now, you've told Judge Whittemore that

8    you're familiar with the *Munday* case.  You've read the

9    *Munday* case?

10   A.    Yes.

11   Q.    Okay.  And the *Munday* case talks about an

12   exception to a prior consistent statement being admitted

13   into court; isn't that true?

14   A.    Yes, it does.

15   Q.    Okay.  And you talked about the exceptions

16   under 90.801 of the Florida Evidence Code; correct?

17   A.    No, I don't think the -- well, if I understand

18   your question, I don't think the *Munday* case talked

19   about an exception.  The *Munday* case said that didn't

20   apply because we're talking about rehabilitation rather

21   than bolstering.

22   Q.    Okay.

23   A.    The way I interpret it.

24   Q.    All right.

25         But in any event, you talked about the

1    exceptions under 90.801 of the Florida Evidence Code;

2    correct?

3        A.    Correct.

4        Q.    One of the exceptions to admitting a prior

5    consistent statement is to rehabilitate someone who's

6    been impeached with an inconsistent statement; correct?

7        A.    I cannot say for sure that's in the code.

8    That's not the way I read it.  That particular section

9    involving prior consistent statements was the three

10   things that, you know, I previously mentioned.

11       Q.    Okay.  And so I understand you correctly, you

12   say that's not the way you read it; is that correct?

13       A.    That's correct.

14       Q.    Okay.  So you could be wrong?

15       A.    Yes.

16       Q.    All right.

17             MR. HALL:  Nothing further, Judge Whittemore.

18             THE COURT:  Redirect?

19             MR. FREELAND:  No redirect, Your Honor.  Thank

20   you.

21             THE COURT:  I'm sorry?

22             MR. FREELAND:  No redirect, Your Honor.

23             THE COURT:  Mr. Lewis, thank you.  Nice to see

24   you, sir.

25             MR. FREELAND:  Our next witness would be

1    Deborah Goins.

2              THE COURT:  Isn't retirement a bit early?

3              MR. LEWIS:  Dropped.

4              MR. FREELAND:  We wish we still had him,

5    Judge.

6              THE COURT:  Dropped.  That's a magical word.

7              COURTROOM DEPUTY CLERK:  Please raise your

8    right hand.

9              (Witness complies.)

10             COURTROOM DEPUTY CLERK:  Do you swear or

11   affirm the testimony that you give in this case will be

12   the truth, the whole truth and nothing but the truth?

13             THE WITNESS:  I do.

14             COURTROOM DEPUTY CLERK:  Please be seated.

15             (Witness complies.)

16             COURTROOM DEPUTY CLERK:  Please state your

17   name and spell your last name for the record.

18             THE WITNESS:  Deborah, D-e-b-o-r-a-h, Goins,

19   G-o-i-n, as in November, s.

20             COURTROOM DEPUTY CLERK:  Thank you.

21                       DIRECT EXAMINATION

22   BY MR. FREELAND:

23      Q.    Please state your occupation.

24      A.    I'm an attorney with the Public Defender's

25   Office in the Tenth Judicial Circuit in Bartow.

1    Q.    All right.

2          Were you involved in Mr. Peter Barrett's case?

3    A.    I was.

4    Q.    In what capacity, please?

5    A.    I first met him in 2001 in the -- when I was

6    employed by the Tampa Public Defender's Office in the

7    homicide division.

8    Q.    How long have you been an attorney?

9    A.    Since 1982.

10   Q.    How many homicide trials have you represented

11   defendants in, approximately?

12   A.    Well, I've tried around 56 homicides, and I

13   have been involved with representing I'd say numerous

14   others.  I mean, I think it would be safe to say maybe

15   another 40 individuals --

16   Q.    In terms of --

17   A.    -- who didn't actually go to trial, but we

18   resolved their cases short of trial.

19   Q.    Approximately a hundred homicides,

20   approximately 50 or so went to actual trial?

21   A.    That's correct.

22   Q.    In Mr. Barrett's case, was this a difficult

23   case to defend?

24   A.    Well, we were running a defense.  I think as

25   Mr. Barrett put it, sort of a -- we were running a self

1    defense case, but it might be viewed as somewhat

2    imperfect but, nonetheless, negating premeditation.

3         And it's always difficult when you have

4    injuries to the extent that this man had been injured,

5    although it was also consistent with a frenzy, which is

6    consistent with no premeditation, as well as statements

7    that were made by some other people who were in that

8    area or lived there.

9         There was a statement made -- testimony about

10   what Mr. Barrett said afterwards, as well as -- well, I

11   think that's what made it a difficult case.  Yes.

12   Q.    Now, this specific statement that you're

13   talking about, was that a statement to a neighbor by the

14   name of Haskins?

15   A.    I think it was H-a-s-k-i-n-s or something.  I

16   don't know how I remember that.

17   Q.    That statement --

18   A.    But I'm saying that that was -- there was a

19   statement that was alleged to have been made by

20   Mr. Barrett when he came out of the house after the

21   incident occurred.  But I can't remember the specifics

22   of it, so I'm not going to state it.  But I'm just

23   saying that it -- it further complicated matters.  And

24   it was necessary to try to somehow impeach that person

25   and impugn their testimony.

1  Q.    Did that statement to Mr. Haskins include a

2  reference to "today is a good day to die"?

3         MR. HALL:   Objection as to relevance.

4         THE COURT:   Well, it may be relevant on the

5  prejudice prong, so I'm going to allow it.

6  BY MR. FREELAND:

7  Q.    Did that --

8  A.    Yes.   That was -- that was the alleged

9  statement.

10  Q.    And after he -- and that statement allegedly

11  made by the defendant was made to the victim?

12  A.    Well, to someone outside of the house.   And I

13  think it may have been Haskins or maybe in the presence

14  of Mr. Haskins.   I don't remember which.

15  Q.    The statement "today is a good day to die" was

16  made in reference to something that allegedly the

17  defendant said to the victim as he was beating him; is

18  that your recollection?

19  A.    I don't know that.   I -- I can't remember it.

20  I thought it was after -- a statement made after he --

21  Mr. Barrett came out of the duplex.

22  Q.    In this case, the -- part of the evidence

23  included evidence that the defendant had struck the

24  victim multiple times with a baseball bat?

25  A.    Yes.

1    Q.    Was there also a knife used?

2    A.    I actually can't recall.

3    Q.    If you --

4         MR. FREELAND:  Your Honor, Exhibit 1-B for the

5    defense has already been admitted.  If I can approach?

6         THE COURT:  Yes, sir.

7    BY MR. FREELAND:

8    Q.    I'm showing you the copy of Detective Rockhll's

9    report.

10   A.    Okay.

11   Q.    If you'll look at page 25 near the bottom of

12   that report, Exhibit 1-B.

13        Does that refresh your recollection as to

14   whether or not there was a knife involved in this case?

15   A.    Okay.  There is an indication on page 25 of

16   Rockhill's report that -- that allegedly Mr. Barrett

17   said that he was -- he took a knife from the kitchen

18   while the victim was attempting to get up off the floor,

19   and he stabbed him once, maybe twice in the chest.

20        And, of course, the medical examiner's evidence

21   would speak for itself in that regard, so -- I believe

22   that there may have been one or two stab wounds, but

23   that's all I could say at this point.  And, again, the

24   ME's test- -- you know, the ME's testimony would speak

25   for whether there was a knife actually used.

1    Q.    So while you're defending a case of self

2 defense, would it not complicate matters, complicate

3 your defense if the evidence was that the defendant left

4 the victim lying on the ground, went and got a knife and

5 came back to do further injury to that victim?  Would

6 that make it more difficult?

7    A.    Well, yes.  I think that's just logical.

8    Q.    Now, with regard to the police reports in this

9 case, the allegation is that you should have done more

10 to try to introduce the police reports.

11         What efforts did you make to introduce the

12 police reports?

13    A.    Well, I actually read a page in the report

14 where I was -- and it must have been after some police

15 officers had testified in the state's case-in-chief and

16 were suggesting that Mr. Barrett had not been truthful

17 with what he told them, or maybe he was -- there was

18 some -- some reason why I was asking at that point to

19 introduce the police statements.

20         And the state -- Ms. Rosamundo at that time

21 posited an objection to that based upon hearsay.  And

22 I -- so I don't -- I know that subsequently that I did

23 cross Mr. -- Detective Rockhill about things that he

24 claimed that Mr. Barrett had said, or I was trying to do

25 things to make it appear as though --

1    Q.    Well, let me stop --

2    A.    -- Mr. Barrett told the truth at trial.

3    Q.    Were you ultimately successful in getting the

4    police reports into evidence?

5    A.    No, not at that time.  The subject was dropped

6    at that point, and I don't recall subsequently trying

7    to introduce them.

8    Q.    Was there anything in the police reports with

9    regard to statements made by the defendant that you were

10   prevented from introducing into evidence?

11   A.    Well, in my opinion, no, in view of my

12   cross-examination of Detective Rockhill.  And there was

13   no specific denial of what I was bringing out from

14   doctor -- Mr. -- Detective Rockhill, so there would be

15   no reason to bring in the report itself as substantive

16   evidence.

17         And, also, there's many things in this report

18   that I would prefer to not have had the jury have,

19   except for the specific statements that we may have been

20   talking about.

21   Q.    Could you be more specific as to what parts of

22   the police report that you think might be damaging to

23   the defense case?

24   A.    Well, I would suspect it would be just the

25   entire thing.  We're talking about making admissions

1   about doing something.  And, of course, our defense was

2   that it was not -- it was only done under difficult

3   circumstances for Mr. Barrett.

4          But I'm saying the report itself had a lot of

5   detail about what they were claiming Mr. Barrett said.

6   And even though Mr. Barrett did testify on direct -- I'm

7   sorry, on cross-examination, even when he was crossed by

8   Shirley Williams, that he would deny it when he said,

9   no, I did not say that.

10         For example, there was something about the DVD

11  player.  He denied that he said that.  He denied other

12  things that Ms. Williams was trying to suggest that

13  he -- he did say to the police, and Mr. Barrett was

14  refuting those.

15  Q.    With regard to the specific allegations that

16  we're here to deal with, the cigarette burn, there was a

17  question by the state as to when the cigarette burn was

18  inflicted?

19  A.    Um-hum.

20  Q.    On page 24 of Detective Rockhill's report,

21  would you agree that that report indicates that the

22  defendant told Detective Rockhill that the cigarette

23  burn was inflicted in December?

24  A.    Let me make sure.  I'm assuming it does say

25  that; although, we don't necessarily agree with that.

1    The report speaks for itself, and I'm trying to find it.

2       Q.    It's about the middle of the page on page 24,

3    starting --

4       A.    Okay.

5       Q.    The paragraph starting "the defendant stated".

6       A.    Okay.   On 211?  If you could just direct me to

7    this particular point so that I can -- I mean, it's

8    either here or it isn't, and that would assist me a lot.

9    Sometime -- okay.

10          It says on page 24 that the defendant allegedly

11   said that sometime in late December, the victim forcibly

12   held the defendant's hand and burned the palm of his

13   hand with a cigarette, and that the detective actually

14   noticed and saw a burn mark in -- on Mr. Barrett's palm.

15          That's what it says here, but that was not

16   Mr. Barrett's position.

17      Q.    The state cross-examined Mr. Barrett on that

18   point, did they?

19      A.    Ms. Williams did.

20      Q.    And the point of that cross-examination was to

21   show that Mr. Barrett's trial testimony was not

22   consistent with what he told law enforcement?

23      A.    Well, that was her position.  But Mr. Barrett

24   had already testified on direct as well as in answer to

25   the cross-examination question by Ms. Williams.

1    Mr. Williams (sic) said, no, it was January.  So that

2    evidence was presented to the jury.

3        Q.    With regard to when the defendant told

4    Detective Rockhill about the existence of the knife, do

5    you recall how many interviews of the defendant there

6    were by Detective Rockhill on February 2nd?

7        A.    Well, let's see.

8        Q.    Do you recall --

9        A.    Having not gone over all the police reports,

10   no, I do not know.

11       Q.    Do you recall that there was more than one?

12       A.    I believe in this case there was more than one

13   statement made by Mr. Barrett to police.

14       Q.    And are you aware from looking at the report

15   there as to whether that report reflects that the knife

16   was mentioned during the first interview or the second?

17   If you could look at the bottom of page 25, it might

18   assist you.

19       A.    All right.  I see where the knife is mentioned

20   on the bottom of 25.

21       Q.    Specifically, the line beginning at 11:55

22   hours.

23       A.    Yes.  It just said that Detective Holland and

24   I, and I'm assuming meaning Rockhill, again met with the

25   defendant in the interview room.

1    Q.    And that was consistent with what the

2  cross-examination of the defendant was, that he did not

3  mention the knife until after the second -- until during

4  the second interview?

5    A.    Yes.  Well, assuming the knife isn't mentioned

6  earlier in this report, that would be -- that at least

7  ostensibly would be true or apparent.  But it does

8  appear that at least the knife was discussed during a --

9  at least a second interview with Mr. Barrett by Holland

10  and Rockhill.

11    Q.    If this is true, if it's true that the state's

12  assertions on cross-examination are consistent with what

13  is stated in the police report, what strategic benefit

14  would there be in introducing the police report?

15         MR. HALL:  Objection.  It assumes facts that

16  are not in evidence.

17         THE COURT:  Overruled.

18         MR. HALL:  Speculation.

19         THE WITNESS:  Well, the problem with

20  introducing the police reports is that they would be

21  giving the jury a piece of paper that says exactly what

22  Rockhill said was said.  So I -- as a tactical move, and

23  not even a tactical move, I think what would be legally

24  permissible.  I wasn't -- I didn't have a basis to put

25  the police reports in in the first place.  And even if I

1    had, I would never have put them in in toto.  I would

2    have had them maybe just redacted only so certain

3    portions would come in that might be relevant to an

4    issue of impeachment.

5           But Mr. Barrett testified during his cross --

6    during his direct examination as well as redirect on

7    what his position was and what he said he did and didn't

8    say to the police.  He reiterated that being crossed by

9    Ms. Williams.

10          And on the cross of Detective Rockhill, I

11   attempted again to force -- you know, fortify the idea

12   that Mr. Barrett either told him similar things or

13   didn't, depending upon the relevance.  And, of course,

14   that's a matter of record.

15          I have nothing else to refer to right now

16   until -- you know, the transcript of this trial.  And if

17   there's something that I failed to cross-examine

18   Rockhill on that maybe should have been, I guess then

19   that's a decision this -- that's maybe what this Court

20   might look at.

21          But I don't have anything else as far as any

22   tactical reasons for not putting in the police reports.

23   I think legally it would have never come in and --

24   because I didn't have a basis to do it because Rockhill

25   wasn't disagreeing with me, and that Mr. Barrett had

1    already made it clear as to his position on each of

2    these issues and, therefore, there was no reason to put

3    the police report in.

4    BY MR. FREELAND:

5        Q.    Have you had a chance to review the transcript

6    of the trial relating to the defendant's testimony, his

7    cross-examination?

8        A.    I did, as well as my cross of Detective

9    Rockhill, and also Shirley Williams' cross of

10   Mr. Barrett.

11       Q.    Is there anything you would change in the way

12   you did things?

13       A.    No.   There's nothing -- no, I guess not.   I

14   mean, I couldn't change the facts, but I tried to deal

15   with them, you know, as best I could under the

16   circumstances.

17            MR. FREELAND:   If I could have just a minute,

18   Your Honor.

19            THE COURT:   While you're conferring, let me

20   ask Ms. Goins.   It's difficult to appreciate exactly

21   what occurred in a trial without looking at the

22   transcript.

23            You testified that initially you attempted to

24   use or introduce some of the statements Mr. Barrett made

25   to Detective Rockhill.   Under what -- when did that come

1   up?  When did that -- and there was a hearsay objection

2   and it was sustained.

3         THE WITNESS:  I think it's on page 237 of the

4   transcript, I believe.  And --

5         THE COURT:  Did you try to introduce the

6   reports or just --

7         THE WITNESS:  Yes.  I'm just assuming that

8   that objection was -- that I was talking about

9   potentially introducing the police reports.  I did not

10  actually make an actual introduction.  But when I

11  mentioned that, because my concern was the state's

12  position was that Mr. Barrett wasn't telling the truth,

13  and they -- they wanted to do everything they could to

14  suggest that he wasn't telling the truth, including

15  having officers testify about certain matters that we

16  took dispute with.

17        So I made a remark about that I was, you know,

18  I guess contemplating that.  And Ms. Rosamundo at that

19  point said to the judge -- and this was not in front of

20  the jury, obviously, this was right before we broke for

21  a recess -- she objected, you know, premised upon

22  hearsay.

23        And so that record speaks for itself, and I

24  believe it's page either 327 or 237.  The prosecutor may

25  be able to direct you to that, and me.  It would help if

1    I had that in front of me, also, Your Honor.

2           MR. FREELAND:  If I could approach, I could

3    give it to her, Judge.

4           THE COURT:  Yes, sir, please, because the

5    question ultimately I have for you is you've explained

6    why you would not necessarily have wanted the entire

7    report in evidence and back in the jury room.  But there

8    was some attempt to use the report or the contents of

9    the report prior to that.  So I'm just trying to

10   reconcile those two positions.

11          THE WITNESS:  Yeah.  Okay.

12          Looking at page -- this does refresh my

13   recollection a little better.  This -- apparently, the

14   judge was asking us, I guess, what witnesses the defense

15   was going to have.  And I was telling him about

16   Detective Masucci, M-a-s-u-c-c-i, and Simonson, and that

17   I was -- and then the state attorney got up and said

18   that she assumed Ms. Goins intended to introduce the

19   defendant's statements which are not admissible.  And I

20   said -- I think I was saying none of that can be

21   admissible because it's self-serving.

22          However -- and then the judge was concerned

23   about we're going to have a proffer on top of all of

24   this.  And I was saying that, "I'll say that in this

25   regard to what they're -- about self-serving, if they're

1  saying we're using a self defense, that's true.

2  However, the information that was given to Rockhill to

3  be construed by the jury however they want to.  But if

4  I'm in a position of not being able to put on

5  information that Mr. Barrett gave to the police that

6  corroborates his testimony here in court, then I think

7  that would be highly improper and, therefore, for him to

8  physically describe what happened and what actions he

9  took are not self-serving.  They go right to the heart

10  of the physical evidence in this case."

11       And the judge says, "Counsel, they're hearsay

12  unless they come in in one of the hearsay objections.

13  Just because they help him or corroborate a portion of

14  the case does not make them admissible.  I don't

15  remember anything in Ehrhardt about that."

16       And that's how they left it at that point.

17  But what ultimately happened is that after being

18  cross-examined, because at this point in time I don't

19  think -- Mr. Barrett had not yet been put on the stand.

20  Once he was and once the prosecutor, Shirley Williams,

21  was cross-examining him and bringing out these matters,

22  I knew that I would be able to bring in a witness to

23  say, well, wait a minute, he actually did say this to

24  you, or essentially things of that nature.

25       And that's why what ultimately happened,

1    though, that Rockhill -- the state said they were going

2    to call Rockhill, and that's when in my

3    cross-examination of him, that's what I did.  I went --

4    I was actually able to get in these statements showing

5    that his trial testimony was consistent with what our

6    defense was showing or presenting.

7              THE COURT:  So you never actually attempted to

8    introduce Rockhill's report itself?

9              THE WITNESS:  No, because -- and I thought the

10   only way that, you know, it might potentially work to

11   try to bring in something like that as substantive

12   evidence is that if Rockhill just denied that he had

13   written a certain thing in his report.

14             THE COURT:  All right.

15             THE WITNESS:  And I -- since I didn't have

16   that kind of information, but I thought that his

17   cross-examination was bringing out to the jury that

18   there were inconsistencies, and that as far as they

19   go -- they went, but not Mr. Barrett, then I felt like

20   the -- I could only assume that at that point there was

21   no reason for me to go further with trying to actually

22   introduce a part of or the entire police report.

23             THE COURT:  So when Ms. -- is it Rosamundo?

24             THE WITNESS:  Rosamundo, yes.

25             THE COURT:  When she indicated that would be

1    hearsay, she was referring to just -- well, let me ask

2    you.  Specifically what was she referring to?  Not the

3    report, I take it.

4           THE WITNESS:  Well, she was just -- yeah.  She

5    was just assuming that anything that I wanted to bring

6    out about the defendant, what he said, would be

7    self-serving hearsay.  And I said, well, not

8    necessarily, and certainly not if you're trying to

9    rehabilitate Mr. Barrett and be able to say that, yes,

10   he did say this to the police or he's denied that he

11   said this to the police.

12          I figured, you know, you'd always be able to

13   do that.  If the police said he told us this, then I'd

14   have a right to put on evidence that I had to be able to

15   show that, no, he didn't.

16          THE COURT:  And you did that through your

17   cross of Detective Rockhill?

18          THE WITNESS:  I was certainly trying to.  And

19   that's why I said earlier, if there's a point that I

20   missed -- and, quite honestly, I'm not in a position

21   right now to make that determination, but if there is a

22   point brought out that I missed, then I think I'm saying

23   the record speaks for itself.

24          I don't have any knowledge of any tactical

25   decisions that I would have made to not bring out a

prior consistent statement to show that on the day of
trial, Mr. Barrett was saying the same things that he
was telling the police the night he spoke to them
following the homicide.

THE COURT:  By the way, was that 237 or 327?

THE WITNESS:  This is 322.  I was close.

THE COURT:  Okay.  All right.

So distinguishing between Rockhill's report,
the document, do I understand correctly that your
testimony is you understood that was not admissible in
and of itself?

THE WITNESS:  In and of itself, it would be a
hearsay objection that would probably be sustained
unless you had specific circumstances under which the
court could allow portions of it for substantive
evidence to actually impeach.

THE COURT:  And that would be if Rockhill said
something inconsistent with that report?

THE WITNESS:  Right.  Or if Rockhill denied
that it was -- something was in his report and it -- I
think I could have done it then.  If he had said, no, I
never -- I never wrote that in my report, I think I
would be able to present that -- that portion of -- at
least that portion of the report as substantive evidence
to negate his claim that it isn't in there.

1          THE COURT:  But in terms of cross-examining

2     Detective Rockhill when he was called on rebuttal,

3     you've said that you were able to get into evidence

4     Mr. Barrett's prior consistent statements.  How did that

5     come in; can you recall right off the top of your head?

6          THE WITNESS:  Well, again, it's just on the

7     face of the -- of the -- of the record because I'm

8     cross-examining him about the window and cross-examining

9     him about the cigarette burn.  If I didn't, I -- I don't

10    know where that would get me because he would just turn

11    around and say, well, my report says it happened in

12    December, not January.

13         Mr. Barrett had testified on direct that it

14    happened in January.  Ms. Williams tried to, you know,

15    impeach him saying, "Well, isn't it true you told the

16    police it happened in December?"  And he says, "No, it

17    happened in January."

18         So when I got Rockhill up there, I had a set

19    of points, and I actually don't have my

20    cross-examination notes with me to see the points I

21    would have covered with Rockhill, but they're in the

22    record.  My whole cross-examination, it's obvious I was

23    trying to do things to show that Mr. Barrett's testimony

24    was credible because it was the same as what the -- what

25    he said on the day that he was being questioned about

1    the homicide.

2         THE COURT:  So whatever statements, prior

3    consistent statements you were able to get into evidence

4    would have come through your cross-examination of

5    Detective Rockhill?

6         THE WITNESS:  That's correct.  I mean, I just

7    assumed that's the way you'd have to do it.  And then if

8    that didn't work, you might try other means if --

9         THE COURT:  All right.

10        I didn't mean to take over, Mr. Freeland.  Do

11   you have any additional examination?

12   BY MR. FREELAND:

13   Q.    Let's assume for the moment that the police

14   report -- that you could have used it.  Would you have?

15   A.    I don't believe I would use the entire police

16   report.  But clearly, there were things that Mr. Barrett

17   told the police that were consistent with our defense

18   and that made --

19   Q.    And that was brought out on your

20   cross-examination or redirect of the defendant and your

21   cross-examination of Detective Rockhill?

22   A.    Exactly.  At least, that's what I was

23   attempting to do.  And that's what I'm saying, if

24   there's something that's not in there, I can't change

25   that now, and I would have no knowledge of a strategic

```
 1   reason why I would not have covered a particular point.
 2           But my goal was to try to show that
 3   Mr. Barrett's testimony at trial was consistent with
 4   what he was telling the police the night of the
 5   incident.
 6       Q.   Very good.
 7           MR. FREELAND:  No further questions, Your
 8   Honor.
 9           THE COURT:  Mr. Hall, cross-examination.
10                    CROSS-EXAMINATION
11   BY MR. HALL:
12       Q.   Attorney Goins, am I saying it correctly?
13       A.   Goins, that's correct.  Um-hum.
14       Q.   I'm sorry.  Just a few questions.
15       A.   Okay.
16       Q.   Do you still have Petitioner's Exhibit 1-B in
17   front of you?  That would be Detective Rockhill's
18   report.
19       A.   I do.
20       Q.   Okay.  Now, you -- during the course of the
21   trial, some questions were asked of Mr. Barrett
22   regarding his residence being burglarized and a DVD
23   player?
24       A.   Yes.
25       Q.   Now, when you look at Detective Rockhill's
```

1   report, can you tell Judge Whittemore, does Detective

2   Rockhill make any reference in his report of asking

3   Mr. Barrett about that at all?  Can you look at that?

4        A.   Yes, I am.  I am.  If you could -- just to

5   assist me, could you reference me to the portion about

6   the window?

7        Q.   Well, that's my point.

8        A.   I know the window is the -- an issue.

9        Q.   Yes, ma'am.  And I guess that's my point.  If

10  you take your time and look at it --

11       A.   Okay.

12            MR. HALL:  If I may, Judge Whittemore, it's

13  not in there.

14  BY MR. HALL:

15       Q.   That's my point, but I could be wrong.  I'm

16  getting older.

17       A.   Okay.

18       Q.   So if you could take your time and look at it,

19  and point out to me if you see any reference by

20  Detective Rockhill as opposed to asking Mr. Barrett

21  anything about a burglary or a window or blinds hanging

22  out of the window at all.

23       A.   All right.

24            MR. FREELAND:  Your Honor, in the interest of

25  time, we're willing to stipulate that it's not in that

1    report.

2              THE WITNESS:  Well, exactly.

3              THE COURT:  All right.

4              THE WITNESS:  It may very well not be.  I know

5    that there was testimony at trial about the condition of

6    the window by the crime scene people and the walk-thru

7    detective, but --

8    BY MR. HALL:

9        Q.    Okay.  And you agree with me it's not in

10   Detective Rockhill's report, that information?

11       A.    Apparently not.

12       Q.    Okay.  And that question that was asked of

13   Mr. Barrett during the course of the trial, was that by

14   the state?  Do you recall?

15       A.    I know Ms. Williams did bring up and made a

16   comment about him, well, wasn't it true that maybe the

17   window got broken because somebody broke in and took a

18   DVD, and I think Mr. Barrett denied that.

19       Q.    Okay.  And let me ask you this.  Did you -- can

20   you recall whether or not you received a report

21   somewhere where Mr. Barrett was asked about that at all?

22       A.    No.

23       Q.    Does that report -- so you're saying that

24   report does not exist or --

25       A.    I don't know.  I mean, I don't recall.  And

1  if -- and if you don't have one, I don't -- I don't

2  know.

3       Q.    Okay.

4       A.    I'm just assuming that maybe there -- that it

5  was not something that was discussed with the detectives

6  because it really wouldn't have been to them probably

7  relevant at that point in time.

8       Q.    Okay.  And when you say "discussed with the

9  detectives," it's also possible that they never asked a

10  question of Mr. Barrett; wouldn't you agree?

11      A.    Well, exactly.  And that's why I said, I assume

12  maybe they wouldn't even ask it because it wouldn't even

13  be relevant to them.

14      Q.    Okay.  Now, also looking at Petitioner's

15  Exhibit 1-B, I'm on page 24.

16      A.    Okay.

17      Q.    As you look down at the bottom of the -- at the

18  bottom of the document, it says page 24 of 52?

19      A.    Yes.

20      Q.    At the very top of the report, that first

21  sentence "the defendant", do you see that sentence?

22      A.    Yes.

23      Q.    And this was Detective Rockhill asking

24  questions of Mr. Barrett; isn't that true?

25      A.    Yes.

1    Q.    Okay.  And would you agree that Mr. Barrett

2  indicated that he met Mr. Gonzalez the 26th of December

3  in 2000?

4    A.    Yes.  I -- yes.  I remember him telling me

5  that, too.

6    Q.    Yes, ma'am.

7    A.    Okay.

8    Q.    Thank you.  And if you could skip down, I don't

9  know, six lines.

10   A.    Um-hum.

11   Q.    And by the way, how many days are in December;

12  do you recall?

13   A.    Thirty-one.

14   Q.    Okay.  And where the sentence reads, "some

15  weeks later," some weeks later, if Mr. Barrett met

16  Mr. Gonzalez December 26th, 2000, some weeks later would

17  put the timeframe in January sometime; isn't that true?

18   A.    Well, I guess it certainly would be subsequent

19  to December.

20   Q.    The 26th?

21   A.    Yes.  I would agree.  Yes.

22   Q.    Okay.  All right.

23         But here in Detective Rockhill's report, he

24  still says mid December.

25   A.    Yes, he does.

1    Q.    Despite several weeks later, he still says mid

2  December?

3    A.    Okay.

4    Q.    Isn't that what's in his report?

5    A.    Yes.

6    Q.    And so the report is wrong?

7    A.    Well, I assume so, yes.  Because we -- if it's

8  starting on the 26th of 2000 --

9    Q.    Yes, ma'am.

10   A.    -- and going to January 2001.

11   Q.    Okay.

12   A.    Yes.

13   Q.    Now, if we go down another I'm going to say

14  five lines, where the sentence begins in the report,

15  "the defendant stated"?

16   A.    Yes.

17   Q.    Keeping the timeframes we've just indicated,

18  the report talks about a burn Mr. Barrett suffers on his

19  hand by the decedent, Mr. Gonzalez.  Do you see that?

20   A.    Yes.

21   Q.    Detective Rockhill records in his report that

22  this was also in December.  But several weeks later

23  would put us into January; correct?

24   A.    I think that would be logical.

25   Q.    Okay.  And that is, in fact, what Mr. Barrett

1  testified to at trial that he didn't say December, he

2  said January on both of these incidents; isn't that

3  true?

4      A.    That's correct.  He said it on direct as well

5  as on cross when he was -- I think he was crossed on

6  that by Ms. Williams.  And I apologize again.  I have to

7  rely upon the transcript, but I thought that she did

8  cross him on that.

9      Q.    Okay.  I can move on.  I don't know if you need

10  a minute.  I see you thumbing through the pages.

11     A.    Okay.  Well, I'm just trying -- I just wanted

12  to make sure that I'm able to answer your questions.

13     Q.    All right.

14           Now, once the state had asked questions of

15  Mr. Barrett suggesting that he was being inconsistent

16  with these dates that I've just covered with you, you

17  had an opportunity to redirect Mr. Barrett; is that

18  true?

19     A.    Yes.

20     Q.    And, also, after Detective Rockhill was called

21  on rebuttal and the state asked him -- asked Detective

22  Rockhill whether or not Mr. Barrett said certain things,

23  you had an opportunity to cross-examine Detective

24  Rockhill?

25     A.    I did.

1    Q.    Did you bring out to him how his report was

2  wrong just like we pointed out just now in court?

3    A.    Well, let me look at Detective Rockhill's --

4    Q.    All right.

5    A.    -- testimony.

6    Q.    Yes, ma'am.

7    A.    And if it isn't in there, you could also so

8  advise.

9          Okay.  Hopefully, I'm trying to be responsive.

10  I will say on page 633 of my cross of Detective

11  Rockhill, at that point Rockhill did acknowledge that --

12  when I asked him about whether he wrote this in his

13  report about the window being -- about the VCR or, I'm

14  sorry -- yes, VCR, not DVD, I don't know -- about the

15  window maybe being broken when this VCR was stolen, and

16  Rockhill said, no, he did not.

17    Q.    He didn't --

18    A.    So that that -- that fact was brought out.

19    Q.    Okay.

20    A.    And now your second question was about the

21  timing of the burn?

22    Q.    Yes, ma'am.

23    A.    Okay.

24    Q.    Was that covered with him by you at all?

25    A.    I don't think that I -- well, unless it's in

here, I don't recall going through the analysis that you

went through, namely, you're talking about a few weeks

and then how could we get from December 26th to

December -- mid December by adding on a few weeks.  I

don't think -- I didn't do what you questioned me about.

Q.    The chronology?

A.    And this record would speak for itself in that

regard.

Q.    Yes, ma'am.

A.    It's not in here.

Q.    You didn't bring out to him about his

inaccuracies referring to December despite several weeks

later?  Did you do that at all?

A.    No.  I think that's what I -- that's what I

just said.  I did not.

Q.    All right.

      Now, I believe Mr. Freeland was asking you some

questions about the knife.  And I believe it was on page

25 of the same report at the bottom.

A.    Correct.

Q.    Petitioner's Exhibit 5.

A.    Yes.

Q.    Which is Detective Rockhill's report.

      Do you recall Mr. Freeland asking you questions

about that?

1    A.    Oh, whether Mr. Freeman asked about the knife?

2    Q.    Freeland, Attorney Freeland right here.

3    A.    Oh, the -- yes, I do.  Yeah.  He was asking me

4  about when it was mentioned, and I said I'm assuming

5  there was a subsequent conversation.  I don't know if

6  it's the second or the third or --

7    Q.    Right.

8    A.    -- whether it --

9    Q.    Right.  I think the question was asked that

10  Mr. Barrett didn't mention the knife until the second

11  interview.  Do you remember that question being asked?

12    A.    Yes.  The inference that was supposedly drawn

13  from the -- that he didn't mention it until the second

14  interview.

15    Q.    Okay.  Now, let's talk about that.

16        When we look at Detective Rockhill's report, he

17  never asked a question during the first interview when

18  we look at his report?

19    A.    No, not that I could see.

20    Q.    Okay.  Did you bring that out to Detective

21  Rockhill at all, that he never asked a question of

22  Mr. Barrett about the knife?

23    A.    On page 637, the mention of a knife by me was

24  characterized in this way.  I said to Detective

25  Rockhill, isn't it -- now, with regards to the knife,

1  you said it was mentioned in the second interview?

2      Q.    Yes, ma'am.

3      A.    Yes.  "And isn't it true that Mr. Barrett told

4  you that he stabbed the guy in the chest?"

5            And Rosamundo objected saying, "This is outside

6  the scope, and there's no discussion of a knife on

7  direct."

8      Q.    I think that was sustained by the trial judge.

9      A.    It was sustained.

10     Q.    And along the same lines, did you ask about the

11 knife, did he ask about the knife in the first interview

12 of Mr. Barrett?

13     A.    No.

14     Q.    Okay.

15     A.    That's where I -- I mention the knife.  That's --

16     Q.    Now, there was some testimony regarding

17 Mr. Barrett retreated to his bedroom and obtained a bat

18 from under his bed, is that --

19     A.    Yes.

20     Q.    Wasn't that his testimony at trial?

21     A.    Yes.

22     Q.    And just following logic, that would have meant

23 that Mr. Barrett was inside of his bedroom when he

24 retrieved the bat; would you agree?

25     A.    Well, I think, as I recall, that Mr. Barrett

1  also testified about that he hit the back of the door

2  with a warning shot.  And I had actually gone over there

3  to that house because the police didn't photograph it,

4  and took pictures of the back of that door showing that

5  there was a mark in the door that could have been

6  consistent with the bat hitting it.  And then I had a

7  witness come to trial and testify that the door was not

8  like that before the incident, if my recollection serves

9  me correctly.

10    Q.    Okay.  And the decedent in this case,

11  Mr. Gonzalez, he followed Mr. Barrett to his bedroom?

12    A.    That's my understanding, yes.  That would be my

13  recollection of how the testimony was coming out and

14  what Mr. Barrett had said.  In other words, he wasn't

15  letting up.  He was pursuing.

16      MR. HALL:  If I can just have a minute, Judge

17  Whittemore?

18      THE COURT:  Yes, sir.

19      (Brief pause.)

20  BY MR. HALL:

21    Q.    When the state had, I'm going to call it, laid

22  traps or asked the question about inconsistencies that

23  Mr. Barrett had testified to, when we look at Detective

24  Rockhill's report, isn't it true that Detective Rockhill

25  even concluded that Mr. Barrett had been consistent in

1    what he had relayed to him?

2        A.     Yes, I believe that he did.

3        Q.     Despite the state's attempt to impeach

4    Mr. Barrett, do you recall ever trying to introduce the

5    consistent statements that Mr. Barrett had testified to

6    or the consistent statements he had previously made to

7    law enforcement on the night of his arrest?

8        A.     No.  And if -- and what -- you're talking about

9    putting the police report in to show that he -- that

10   what he said in court was consistent with what's in the

11   report?

12       Q.     Either the police report or the consistent

13   statements without introducing the police report.

14       A.     No.  I didn't go through tit for tat.  I

15   believe I may have argued on closing to the jury that

16   they didn't hear anything to refute those statements, in

17   other words, which meant that's what he told them.  But

18   other than that, no, I did not ask to -- I did not go

19   down the line to -- because it's obvious from the record

20   I didn't.

21       Q.     Yes, ma'am.

22       A.     I didn't go, did he tell you this, did he tell

23   you this, did he tell you this.  But I'm just saying

24   oftentimes what I would do in closing is point out to

25   the jury that the state called a rebuttal witness for

1    the purpose of trying to, you know, impeach Mr. Barrett,

2    and yet you didn't hear the detective say that

3    Mr. Barrett didn't say this or didn't say that.

4         So if -- I don't know if I did it in this case,

5    but that's -- that would be my tactic and what I would

6    do in such an instance.  But I did not introduce the

7    police report.

8    Q.    Okay.  Now, you indicated to Judge Whittemore

9    that there was a point when there were discussions about

10   introducing I believe it was the police report or

11   consistent statements, and there was some type of an

12   objection by the prosecutor?

13   A.    Yes.

14   Q.    Okay.  And that was before I believe

15   Mr. Barrett had even testified; is that true?

16   A.    Yes.

17   Q.    Okay.  Did you try to proffer those statements

18   at that point?

19   A.    I don't -- the record wouldn't indicate that I

20   did.

21   Q.    Okay.  And then subsequent to Detective

22   Rockhill's rebuttal, did you ever try to proffer the

23   report itself or consistent statements into the record?

24   A.    I don't know.  The record would speak for that.

25   And quite honestly, I did not -- and maybe I -- I didn't

1   realize I should have, but maybe I should have read the

2   entire trial transcript.  But it's either in there or it

3   isn't.  Do you know what I mean?

4        Q.    Yes, ma'am.

5        A.    Okay.

6        Q.    Mr. Freeland was asking you about a statement

7   that Mr. Barrett supposedly stated that it was a good

8   day to die, that Mr. Barrett had made that statement --

9        A.    Yes.

10        Q.    -- concerning the incident?

11        A.    Yes.

12        Q.    Is that in proper context regarding the entire

13   statement that was said by Mr. Barrett and why he said

14   it?

15        A.    Well, I think that would go to the other

16   witness, because I remember that the witness who

17   supposedly said that, our point was that it wasn't said.

18        Q.    Okay.

19        A.    And, therefore, we tried to discredit that

20   witness.  But I don't have that in front of me.

21        Q.    Okay.

22        A.    Okay.

23        Q.    Do you -- I'm sorry.  Go ahead.

24        A.    So you're talking about the context.  You

25   mean --

1    Q.    Well, let me ask the next question.

2          Was -- when Mr. Barrett supposedly made this

3    statement, did he also indicate that he was afraid of

4    Mr. Gonzalez?

5    A.    I believe that he may have made some statement.

6    And, again, I know that this would have come out at

7    trial.

8    Q.    Yes, ma'am.

9    A.    So I would rely upon the record.

10   Q.    Yes, ma'am.

11   A.    But this was an issue about whether -- because

12   they were trying to characterize Mr. Barrett as being,

13   you know, this kind of brute, a 140-pound brute, you

14   know, picking on this other guy.  And I thought that

15   that was -- you know, that's -- my whole point was I

16   don't know what he -- exactly what he said that night,

17   but I know what came out at trial.

18   Q.    Okay.

19   A.    And our point was to try to show that those

20   people were exaggerating or maybe wrong about what was

21   said.

22   Q.    Okay.  And you made reference to someone

23   thinking Mr. Barrett was a 140-pound brute.

24   A.    I said that.  Those are my words.

25   Q.    Okay.  All right.

1      A.      Okay.

2      Q.      Well, let me ask you this.  You saw the

3 photographs of the decedent in this case?

4      A.      Numerous photographs.

5      Q.      And do you recall his size?

6      A.      He was large.

7      Q.      Okay.

8      A.      And that was something that was brought out, I

9 would certainly think, yes, at the trial.

10      Q.      Much bigger than Mr. Barrett?

11      A.      He was.  Um-hum.

12      Q.      Did you do a proffer during the course of your

13 representation of Mr. Barrett pretrial on any --

14      A.      I don't know.  I don't know.

15      Q.      That wasn't a fair question.

16      A.      Well, I mean, either it's in the record or it

17 isn't.  That's what I'm saying.  I did not -- I have not

18 read the whole pretrial record and all the motions and

19 hearings and things that happened before trial.  I may

20 have.

21              MR. HALL:  May I approach the witness?

22              THE COURT:  Yes, sir.

23 BY MR. HALL:

24      Q.      I'm showing you what's been marked for

25 identification as Petitioner's Exhibit 3.  Take your

1    time and tell us if you recognize that document.

2        A.    Oh, I do.  And what that is --

3        Q.    Does that indicate a pleading you filed in the

4    representation of Mr. Barrett?

5        A.    Yes.

6        Q.    Okay.  Is it substantially in the same form as

7    you did when you filed it sometime ago in this case?

8        A.    Yes.

9             MR. HALL:  I'd offer into evidence

10   Petitioner's Exhibit -- I believe that's Number 3.

11            THE COURT:  Is there any objection?

12            MR. FREELAND:  No objection, Your Honor.

13            THE COURT:  Petitioner's 3 is received.

14            (Whereupon, Petitioner's Exhibit Number 3 is

15   received into evidence.)

16            MR. HALL:  May I re-approach the witness?

17            THE COURT:  Yes, sir.

18   BY MR. HALL:

19       Q.    I'm going to show you what's been marked for

20   identification as Petitioner's Exhibit Number 2.

21       A.    Um-hum.

22       Q.    Do you recognize that document, also?

23       A.    Yes.

24       Q.    It's the jury note that was -- that the jury

25   asked in the trial of Mr. Barrett?

1    A.    Yes.

2    Q.    And it fairly and accurately represents the

3 jury question that the judge -- state judge brought to

4 the attorneys' attention at that time?

5    A.    It appears to be so, yes.

6         MR. HALL:  I'd offer into evidence

7 Petitioner's Exhibit Number 2.

8         MR. FREELAND:  Your Honor, I'm not sure of the

9 relevance of that.

10         THE COURT:  Overruled.  Petitioner's 2 is

11 received.

12         (Whereupon, Petitioner's Exhibit Number 2 is

13 received into evidence.)

14         MR. HALL:  Thank you, Judge.  I'm just trying

15 to make sure I've covered everything for Mr. Barrett.

16         (Brief pause.)

17         MR. HALL:  We have nothing further.

18         THE COURT:  Any redirect?

19         MR. FREELAND:  Briefly, Your Honor.

20                    REDIRECT EXAMINATION

21 BY MR. FREELAND:

22    Q.    Ms. Goins, specific to the issue of whether you

23 should have used the police reports, the police

24 reports -- the one that you have in front of you,

25 Detective Rockhill's report, does not contain any

1    statement in it from the defendant that he told him

2    about the Bible during the first interview.  Would you

3    please confirm that or -- or not, as well as a reference

4    to the knife during the first interview.

5        A.    I don't see a reference to a knife or the Bible

6    until the subsequent interview.

7        Q.    So if the defendant --

8        A.    According to this report.

9        Q.    If the defendant was impeached during the

10   state's cross-examination of him that his trial

11   testimony that he told them about the knife and the

12   Bible during the first interview, the police report

13   would not help you in that event; is that correct?

14            MR. HALL:  Objection as to improper foundation.

15            THE COURT:  I'll allow it.

16   BY MR. FREELAND:

17       Q.    The police report --

18       A.    Well, no.  I'm saying the police report speaks

19   for itself, okay, it shows that it was in the second

20   interview.

21            The inference to be drawn, I'm sure, is what

22   the state was going after, and that I did not

23   specifically cross --

24            MR. HALL:  Objection as to speculation.

25            THE COURT:  I'm going to allow it so I --

1          THE WITNESS:  What?  Well, I --

2          THE COURT:  Just a moment, ma'am.  I'm going

3   to allow it so I have an appreciation for the context in

4   which the witness has responded to the initial question.

5          THE WITNESS:  All right.  And I'm just

6   pointing out that the police report speaks for itself.

7   And it appeared to be in a subsequent statement, whether

8   it was the second or the third, I don't know.  And that

9   I did not specifically say to Detective Rockhill, well,

10  isn't it true that you didn't ask him about the knife in

11  the first statement.  That's true, I didn't.  I asked

12  him about what Mr. Barrett told him upon being asked.

13  BY MR. FREELAND:

14     Q.    Mr. Barrett's testimony was that he did reveal

15  that during the first interview; is that correct?  Is

16  that your recollection?

17     A.    I don't know.

18     Q.    That was the basis of impeachment; was it not?

19     A.    Well, it will be in Mr. -- in his testimony in

20  the -- quite honestly, I -- I don't remember that

21  detail.  I don't know if he specifically did or didn't.

22     Q.    That's fair.

23     A.    But it will be in the transcript if he did.

24     Q.    The record speaks for itself.

25     A.    Okay.

1     Q.     The cigarette burn, that document you have in

2   front of you says that it occurred in December,

3   Detective Rockhill's --

4     A.     Well, it -- that's what it says in the report.

5     Q.     The report also contains no indication that the

6   defendant told Detective Rockhill that the victim

7   entered his room prior to the -- prior to him striking

8   him with the bat; correct?

9     A.     No.  I don't believe that -- entering his room,

10   is that what you're saying?

11     Q.     (Moves head up and down.)

12     A.     No, I don't believe so.  I don't believe it is.

13     Q.     Your client -- your client then testified --

14   did your client testify that the victim lunged at him

15   and he reacted to being attacked?  Is that basically

16   essentially what he testified to?

17     A.     Well, that's my recollection, and that there

18   had been a warning shot on the back of the door, which

19   was the back of the door that got hit.  And then I

20   believe the door got opened, and that's how the

21   confrontation -- how it got to the point where it got,

22   where it was actually a physical blow struck.

23     Q.     So his statement is not refuted by the police

24   report; is it?

25     A.     I don't think the statement about how that

1  happened is really refuted by the police report, no.

2  That's why his statement was sort of consistent with

3  what we would be able to present and try to present at

4  trial as the -- in my opinion, the best way to approach

5  this case in view of the fact that intoxication was no

6  longer allowed as a defense.

7        MR. FREELAND:  I have no further questions,

8  Your Honor.

9        THE COURT:  Let me ask a couple of questions,

10  Ms. Goins, if you don't mind.

11        Number one, is it accurate that you received

12  Detective Rockhill's report in discovery and reviewed it

13  with Mr. Barrett?

14        THE WITNESS:  Yes.

15        THE COURT:  So in preparing for trial, you

16  obviously were aware of what Rockhill was likely to say

17  that Mr. Barrett told him during these interviews?

18        THE WITNESS:  Yes.

19        THE COURT:  Did you take his deposition?

20        THE WITNESS:  Yes, I'm sure I did.  Um-hum.

21        THE COURT:  And do I understand correctly that

22  you knew of no basis in which to introduce the report

23  itself other than impeaching an inconsistent statement

24  by Detective Rockhill?

25        THE WITNESS:  You -- oh, if you mean I didn't

```
 1   know of any way to get the statement itself in unless
 2   Rockhill --
 3            THE COURT:  The report.
 4            THE WITNESS:  -- had specifically denied
 5   writing something that was in that report.
 6            THE COURT:  And I'm saying report, not --
 7            THE WITNESS:  Yes.  I'm referring to the
 8   report.
 9            THE COURT:  So when the hearsay objection came
10   up, that was -- did that come up in the context of the
11   anticipated attempt on your part to introduce prior
12   consistent statements through Mr. Barrett?
13            THE WITNESS:  Yes.  I think -- I mean, I think
14   that's what Ms. Rosamundo was thinking, that she was
15   just going to bring that in for self-serving statements
16   and --
17            THE COURT:  In other words, you -- she was
18   going to object to you saying, Mr. Barrett, did you tell
19   Detective Rockhill such and such?  That's what she was
20   going to be objecting to?
21            THE WITNESS:  Well, actually, she was
22   objecting because the question in the record came up
23   about maybe I'll -- just to make this clear, on 322 and
24   323, "Ms. Goins intends to introduce the defendant's
25   statements which are not admissible."
```

```
 1              And I said, "Well, I think they're saying none
 2    of that can be admissible because it's self-serving."
 3    And then I said, "But in regards to they're saying
 4    self-serving, if they're saying we're using a self
 5    defense, that's true.  However, the information that was
 6    given to Rockhill to be construed by the jury however
 7    they want to, but if I'm in a position of not being able
 8    to put on information that Mr. Barrett gave to the
 9    police that corroborates his testimony in the court,
10    then I think it would be highly improper and, therefore,
11    he ought to be able to physically describe what happened
12    and what actions he took are not self-serving, this
13    going to what he told the police."
14              I guess -- and, you know, I read -- I hate
15    reading myself on the record because I'm thinking --
16              THE COURT:  That's the best thing a lawyer can
17    do, by the way.
18              THE WITNESS:  It is frightening.  Oh, you bet.
19    Yes.  And as I look at this, because I don't know
20    exactly what was going on in my head at the moment, but
21    it definitely had to do with the idea of being able to
22    show that the detective, having testified about things
23    that Mr. Barrett said, that I wanted it to be clear that
24    Mr. Barrett told the police the same thing that Rockhill
25    said.  I mean, that would be for the purpose of
```

1   bolstering his testimony.

2          THE COURT:  But the context would have been,

3   would it not, in terms of what Rockhill related to the

4   jury, you were --

5          THE WITNESS:  Yes.

6          THE COURT:  She was expecting that you might

7   say, well, didn't Mr. Barrett tell you this, didn't he

8   tell you this?

9          THE WITNESS:  Um-hum.

10          THE COURT:  Is that right?

11          THE WITNESS:  Well, if I was asking Barrett.

12   If I said, well, did you tell the police that --

13          THE COURT:  Either way.

14          THE WITNESS:  -- you hit the door with the

15   bat, yeah.  I mean, that's not --

16          THE COURT:  Mr. Barrett or through Detective

17   Rockhill.

18          THE WITNESS:  Right.

19          THE COURT:  All right.

20          THE WITNESS:  Because Rockhill undoubtedly had

21   already testified.

22          THE COURT:  But in light of that hearsay and

23   Judge Barber sustaining the objection --

24          THE WITNESS:  Right.

25          THE COURT:  -- you refocused and redirected

1    your tactical efforts?

2              THE WITNESS:  I think I just --

3              THE COURT:  I think you said earlier you

4    dropped it and moved on or something.

5              THE WITNESS:  Apparently it must have been

6    dropped, or whether it was brought up during the direct

7    examination of Mr. Barrett, that would be the other

8    place where you would be able to see if I was trying to

9    bring in certain things in that they're objected to

10   on -- on hearsay grounds.

11             But I think what happened is Mr. Barrett --

12   you know, he gave his testimony, and it was consistent

13   with what Rockhill had said, which sort of speaks for

14   itself.

15             I'm just saying I'm sort of at a loss to

16   understand exactly what it is I was trying to

17   accomplish.  But I think ultimately in the case, I

18   certainly tried to point out to the jury that his

19   information was consistent and I -- I don't know.

20             So maybe I can't specifically answer the

21   Court's questions because I don't know where I went from

22   there, except whatever happened in the transcript.

23             THE COURT:  Let me read a statement to you.

24   And I don't want an argument, but I'm -- my question is

25   going to be if you remember.

1          THE WITNESS:  Um-hum.

2          THE COURT:  What was your trial strategy, this

3    statement.  "Counsel was deficient for not introducing

4    petitioner's police statements to show they were not

5    inconsistent with his testimony.  Counsel should have

6    known that the statements became admissible under the

7    rule of completeness and the concept of opening the door

8    once the state used parts of the statements to impeach

9    petitioner's testimony."  That is the accusation that

10   we're focusing on.

11         THE WITNESS:  All right.  So I guess that

12   might go back to Rockhill's -- well, I guess if we're

13   talking about --

14         THE COURT:  Once the state used parts of the

15   statements to impeach petitioner's testimony, so the

16   point of time the accusation focuses on the rebuttal.

17         THE WITNESS:  And the rule of completeness,

18   which I could have brought out, and maybe I did, with

19   Detective Rockhill's testimony initially as well as what

20   I attempted to do when he was put on in rebuttal,

21   because I was aware of the rule of completeness.

22         So that's why I'm saying to you I'm sort of at

23   a loss to understand the context of pages 322 to 324,

24   because if they had brought out part of it, I would have

25   a right to bring out all of it.

1          Mr. Barrett had not yet testified.  But his

2     testimony was going to be consistent with many things

3     that Rockhill said.  And then when they put Rockhill on

4     rebuttal, I was crossing Rockhill to try to, you know,

5     rehabilitate and reinforce Mr. Barrett and that he was

6     being consistent with what he had told the police.

7          THE COURT:  So you were aware when you

8     cross-examined Detective Rockhill during rebuttal that

9     under this rule of completeness, you could essentially

10    bring out the prior consistent statements of

11    Mr. Barrett?

12          THE WITNESS:  Absolutely.

13          THE COURT:  All right.

14          THE WITNESS:  That -- absolutely.  And quite

15    honestly, I -- I really didn't know to do so, but I

16    didn't review Detective Rockhill's direct examination

17    and cross-examination.  But I'm well aware of the rule

18    of completeness.

19          That's why when she was talking -- when the

20    state attorney was talking about the hearsay aspect of

21    it I --

22          THE COURT:  Well, if --

23          THE WITNESS:  It wouldn't -- it wouldn't -- in

24    other words, the rule of completeness would allow you to

25    bring it in, regardless.

1        THE COURT:  And let me ask you, back -- again,

2   put yourself back in time, and it may be the same today.

3   If you were to simply call Detective Rockhill as a

4   witness and ask him, would you tell the jury what my

5   client told you about the knife, there would be a

6   hearsay objection, would there not, which would be

7   sustained?

8        THE WITNESS:  Yes.  Unless I had set up the

9   extrinsic impeachment of it and brought in Rockhill to

10  refute something the state had been trying to do

11  earlier.  But it didn't seem necessary in view of the

12  fact that the detectives testified, Mr. Barrett

13  testified, he was crossed by Ms. Williams, and then they

14  brought Rockhill in in rebuttal, and I was able to go

15  back and say, well, he did this or he said this or he

16  didn't say this or whatever.  So that's how it occurred

17  in this case.

18       THE COURT:  As you look back on this trial, to

19  the extent you can remember, was the case tried

20  consistent with your strategy, your defense theory?

21       THE WITNESS:  It was.  And -- yes.  And even

22  when I was the defense lawyer, Mr. Hall, I believe, you

23  know, handed me -- I was looking at this Exhibit Number

24  2, petitioner's exhibit, the jury question, and the --

25  I've had this question so many times, we need Peter

1   Barrett's testimony, and the judge going back with the

2   standard instruction that the jury is to rely upon its

3   individual and collective memory as to that as opposed

4   to having the testimony read back.

5          I don't know what was said on the record.

6   It's like a double bladed sword from a tactical

7   testimony if you have your client's testimony read back

8   because you're never quite sure where that's going.

9          So, obviously, Mr. Barrett's testimony was

10  important.  But I don't know if -- but the issue here

11  today is did I try to do what I could do to make sure

12  that the jury knew that Mr. Barrett's testimony was

13  consistent with what he told the police.  I tried to do

14  that.

15         THE COURT:  And Rockhill admitted that he was

16  consistent in everything he told the police; right?

17         THE WITNESS:  Right.  But if I didn't succeed

18  at that, I guess that's something for the Court to

19  determine.  And that's what I can say.

20         THE COURT:  I don't have any further

21  questions.

22         Mr. Hall, do you have any additional questions

23  of Ms. Goins?

24         MR. HALL:  If I can have just one minute,

25  Judge.

1          (Brief pause.)

2          MR. HALL:  No further questions, Judge

3    Whittemore.

4          THE COURT:  Mr. Freeland, any additional

5    questions?

6                    REDIRECT EXAMINATION

7    BY MR. FREELAND:

8     Q.    The only question I have with regard to the

9    last -- can you pull that -- with regard to the last

10   document, the request from the jury, do you recall

11   whether you or Mr. Hyman, co-counsel, discussed that

12   with your client, the response, I mean?

13    A.    I don't recall.  I just assume that we did, we

14   would because --

15         MR. FREELAND:  May I approach with the --

16         THE WITNESS:  -- you have to do that.

17         MR. FREELAND:  May I approach with a portion

18   of the transcript, Your Honor?

19         THE COURT:  Yes, sir.

20   BY MR. FREELAND:

21    Q.    Please review that portion of the transcript

22   and see if that refreshes your recollection.

23    A.    And you've handed me page 713 to 715.  You want

24   me to read the whole thing?  Is that what you're asking?

25    Q.    You can actually look to the bottom of page 714

1  and see if that recalls -- refreshes your recollection.

2  This is in reference -- would you agree that this is in

3  reference to that request from the jury?

4      A.    Oh, I see.  Yeah.  Mr. Hyman had indicated --

5  apparently Mr. Hyman didn't notice the defendant wasn't

6  present.  But once that was brought to his attention,

7  they went -- apparently we must have both gone back and

8  talked to him, although my name is not mentioned in this

9  transcript and --

10     Q.    Look at the top of page 715, please.

11     A.    All right.  All right.

12           Right.  It would appear that on page 17 -- 714

13 to 715 indicates that it was discussed with Mr. Barrett

14 and that we agreed that that was probably the best

15 way -- that was the best way to go.  So -- and I said it

16 could be dated and signed, meaning what the judge wrote

17 about the jury relying upon its own recollection.

18     Q.    So this was not only your strategy, but your

19 client also agreed to that?

20     A.    Well, that would reflect that.  I would not

21 have done otherwise.

22     Q.    Thank you.

23           MR. FREELAND:  No further questions.

24           THE COURT:  Thank you, ma'am.  You may step

25 down.  And I appreciate you being available.

1          Mr. Freeland?

2          MR. FREELAND:  We have no further questions,

3     Your Honor, no further witnesses, I mean.

4          THE COURT:  Any additional witnesses,

5     Mr. Hall?

6          MR. HALL:  Judge, I've got a problem I'm trying

7     to deal with.  If I can just have a minute, please.

8          THE COURT:  Sure.

9          MR. HALL:  And before --

10         THE WITNESS:  Before I leave?

11         MR. HALL:  And I know that's not your common

12     practice, but I'm just trying to --

13         THE COURT:  That's fine.  If you can stand by

14     for a moment, Ms. Goins.

15         THE WITNESS:  I'll just sit right back down.

16         (Brief pause.)

17                    RECROSS-EXAMINATION

18     BY MR. HALL:

19     Q.    Mr. Freeland was asking you a question about

20     the response to the jury question or note.

21     A.    Yes.

22     Q.    And the judge indicated that the jury was to

23     rely upon their own recollection?

24     A.    Yes.

25     Q.    Okay.  So the police report that we've been

1    talking about, no police reports were in evidence; is

2    that true?

3        A.    That's true.  Um-hum.

4        Q.    And Mr. Freeland was asking you, you consulted

5    with Mr. Barrett regarding that was the proper way to

6    handle the question, you consulted with Mr. Barrett

7    about that?

8        A.    I -- the -- what the record would indicate is,

9    yes, we did.  In other words, it was brought to Mr.

10   Hyman's attention who spoke right up that -- that

11   Mr. Barrett wasn't present, so then --

12       Q.    He was brought out?

13       A.    We conferred with him.  I -- I would -- I'm

14   just saying it would be my practice.  I would never not

15   confer before I made a decision like that.

16       Q.    Okay.

17       A.    I'd have to explain what the jury question

18   meant, in my opinion, and what we should do.

19       Q.    Explain it to the client?

20       A.    Yes.

21       Q.    Okay.

22       A.    Absolutely.

23       Q.    Was Mr. Barrett's response based upon your

24   advice, as you recall, about the jury note?

25       A.    You mean did Mr. Barrett agree with our

1    strategy of what we were going to do?

2        Q.    Yeah, about how to answer -- the judge's

3    response about how to answer the jury question or note.

4        A.    I don't recall if he specifically gave the

5    language.  I know the instruction that has to do with

6    telling the jury that they could rely upon their own

7    recollection.  So I don't -- I don't have that

8    information.

9            I haven't had a chance to review my trial

10   notes, either, which I may very well have made a note --

11       Q.    Right.

12       A.    -- about what we discussed and what

13   Mr. Barrett's position was.

14       Q.    Right.

15       A.    Since I'm at a loss to respond to that

16   specifically.

17       Q.    And I understand.  And I know you're a seasoned

18   attorney.  Let me ask the question this way.

19           In answering jury questions, the client -- your

20   client must be present in a criminal context; you would

21   agree with that?

22       A.    Absolutely.

23       Q.    Okay.  And would I be fair in saying -- would

24   it be fair to say that your practice is to confer with

25   the client regarding how to -- if he or she is in

1   agreement with how the judge proposes how to respond to

2   a jury note or jury question?

3       A.     That's true.  And the only times that there

4   might be an exception is if the jury asked for a new pot

5   of coffee or something of that --

6       Q.     Okay.

7       A.     I mean, seriously.  I'm not being glib.  But I

8   mean, that would be the kind of thing where I wouldn't

9   think it would matter whether the client was involved.

10      Q.     And you have no reason to doubt that you did

11  confer with Mr. Barrett regarding how the judge proposed

12  to answer the question?

13      A.     No, I don't.  I don't question that I -- that I

14  did.

15      Q.     Okay.

16             MR. HALL:  Nothing further, Judge Whittemore.

17  I do have one issue I'd like to take up with the Court

18  that I think came out in the context of this hearing,

19  Judge Whittemore.

20             THE COURT:  Does it have anything to do with

21  Ms. Goins?

22             MR. HALL:  Well, to a certain degree, she may

23  be able to shed some light on it, if I may.

24             There was a question regarding the DVD player and

25  burglary, and the window being up at Mr. Barrett's

1    residence.  And I had asked Ms. Goins -- that question

2    was asked somewhere, but it's not in Detective

3    Rockhill's report.  So I don't want to waive on any type

4    of *Richardson* claim or even a *Brady* claim, because that

5    statement came from somewhere.

6          And on my questions of Attorney Goins, I was

7    asking her where is that statement.  And I want to make

8    sure that nothing was withheld from her because that

9    statement -- that is not even -- that is --

10          THE COURT:  That's for another day, Mr. Hall.

11          MR. HALL:  Okay.

12          THE COURT:  We're limited in this evidentiary

13    hearing to the issue that I have framed in my order.

14          MR. HALL:  Okay.  Nothing further.  Thank you.

15          THE COURT:  Thank you, Ms. Goins.  You may

16    step down.  And, again, thank you for being here.

17          THE WITNESS:  Thank you, sir.

18          THE COURT:  Is there any additional witnesses

19    from either the respondent or the petitioner?

20          MR. HALL:  Not from the petitioner.

21          MR. FREELAND:  And not from the respondent,

22    Your Honor.

23          And just to clarify the record, we've been

24    using documents here to refresh this witness's

25    recollection and other witnesses' recollection.  And all

1   of those documents, for the purposes of the record, are

2   from the trial transcript which occurred in October of

3   2001 for Mr. Peter Barrett.

4           THE COURT:  That was my understanding.

5           Well, I'll hear some brief argument,

6   gentlemen.  I don't need dissertations on this.  It's a

7   very discrete issue.

8           It's very obvious to me and no sense debating

9   that Ms. Goins had Detective Rockhill's report, reviewed

10  it with Mr. Barrett.  He acknowledges that.  There were

11  some things in it that could be beneficial to

12  Mr. Barrett.  So it's not as if the lawyer was

13  inattentive or wasn't prepared.

14          Secondly, it's apparent to me, based on the

15  testimony as well as Mr. Barrett's testimony, that this

16  case was tried in accordance with this, quote, unquote,

17  imperfect self defense theory and in accordance with the

18  strategy and theory defense that Ms. Goins had planned.

19          To the extent that the pleadings and perhaps

20  even the Court's orders may have focused somewhat on the

21  report in and of itself, I don't think there's any

22  dispute that that report in and of itself would not have

23  come into evidence.  It would be rank hearsay.

24          And I believe the issue, Mr. Hall, and you can

25  confer with Mr. Barrett, but the issue here is whether

1    or not Ms. Goins was deficient in her trial performance

2    in failing to bring out through the cross-examination of

3    Detective Rockhill that Mr. Barrett had made statements

4    consistent with his trial testimony.  She has testified

5    that she did her best to do that.

6            So I think we have to focus on what happened

7    during Detective Rockhill's cross-examination.  And if

8    she attempted to do that, then there can't be deficient

9    performance.  If she didn't attempt to do it, then

10   perhaps we can discuss that.

11           It is the petitioner's burden.  I'll hear

12   whatever comments you have.

13           MR. HALL:  Judge Whittemore, I would just offer

14   up briefly the record does speak for itself.  But I

15   certainly would ask the Court if -- and I know you said

16   you reviewed it and you're familiar with it.

17           THE COURT:  Well, when I say I reviewed it,

18   that doesn't mean I read every word of the transcript.

19   I'll be candid with you.  I mean, I review what I need

20   to review to understand the contentions and the

21   theories.  But under deference to state court

22   proceedings, that ordinarily does not require that we

23   read every single word of every single transcript.  You

24   know that.

25           MR. HALL:  Yes, sir.

1          THE COURT:  But here we're talking now about a

2    cross-examination of Detective Rockhill, and I don't

3    recall having read that.

4          MR. HALL:  Well, I didn't want to be -- come

5    off as saying or suggesting you hadn't done anything,

6    Judge.  That's the reason why --

7          THE COURT:  No, no.  I just wanted to let

8    you -- if you've read it and you can enlighten me, I'll

9    certainly -- I'm going to read it.

10          MR. HALL:  But I would ask the Court when the

11    trap, if you will, is laid by the state asking

12    Mr. Barrett, didn't you say this, didn't you say this,

13    did you say such and such, that's what I call laying the

14    trap.  And then on rebuttal, Detective Rockhill comes in

15    and he says these things on cross by Ms. Goins, a very

16    seasoned attorney.  I appreciate her being here.

17          But I think when you look at the transcript,

18    there are a lot of things.  When she says, well, I tried

19    to show that he was consistent, I think that's refuted

20    by the record.  And especially the inconsistencies that

21    were brought out when we look at -- when we look at his

22    report.  The dates are just completely wrong.  He says

23    December.  He has no proffer at all.

24          THE COURT:  Well, the claim is that she didn't

25    bring out his prior consistent statements.  That is the

1    claim and that's the only issue before me.

2                 MR. HALL:  Yes, sir.

3                 THE COURT:  Because that's the only exhausted

4    claim.

5                 MR. HALL:  Yes, sir.

6                 THE COURT:  So whether she could have brought

7    out some other consistency or wrong date, that's not the

8    issue here today.  The issue is whether she was

9    deficient in not introducing prior consistent statements

10   of Mr. Barrett during her cross-examination of Detective

11   Rockhill.

12                I read the issue to Ms. Goins.  It's paragraph

13   67 in the petition.  And again, I'm assuming once the

14   state used parts of the statements to impeach

15   petitioner's testimony, that could be Detective Rockhill

16   on rebuttal or in theory on the cross-examination of

17   Mr. Barrett.  So either way.

18                MR. HALL:  Yes, sir.  I would just say -- I

19   would just ask the Court if it would just re-review that

20   portion of whether or not she did bring out the

21   consistency in any effort at all in making its

22   determination of whether or not a performance prong of

23   *Strickland* has been met.

24                I don't seem to recall, because I know the

25   Court's question is did she do it at all.  I can't

1   recall, and we certainly -- and I understand the Court's

2   ruling, not to the extent we would like, but if she did

3   it at all, I can't recall if that's there.

4          She did point out, Judge, on examination that she

5   wasn't even aware, and don't quote me on this, but

6   somewhere she said she didn't recall the rule or she

7   could have done something consistent with the rule,

8   something to that effect.  And I would ask the Court to

9   weigh that in its analysis, as well.

10          THE COURT:  Well, no one asked her about the

11   *Munday* case.

12          MR. FREELAND:  Well, Your Honor, the record

13   does speak for itself.

14          THE COURT:  What do you recall of either the

15   redirect of Mr. Barrett by Ms. Goins or the

16   cross-examination of Detective Rockhill concerning

17   statements that Mr. Barrett made to the police during

18   the interviews?

19          MR. FREELAND:  My recollection of it is she

20   was able to bring out through her own client the things

21   that he needed to put before the jury.  There were

22   things that he said that were not reflected by the

23   police reports.

24          Bringing in the police reports themselves

25   would not have helped her.  And that is what she

1  testified to here today.

2       THE COURT:  Well, that's why I'm focusing not

3  on the report but on prior consistent statements that

4  Mr. Barrett made to the police during the interviews.

5       So it's one thing to bring out his testimony,

6  which might happen to be what he told the police.  But

7  it's another thing to bolster that testimony, if you

8  will, or rehabilitate, if you will, by bringing out the

9  fact he said the same thing when the police interviewed

10  him right after the event, therefore, he's been

11  consistent.  And that's an argument the jury hears.

12  That's what I'm looking at.

13       MR. FREELAND:  Well, you'll forgive me, but my

14  understanding of the rule of law on that is that prior

15  consistent statements, at least here in the Second

16  District Court of Appeals in Florida, would not normally

17  be admissible.  As Mr. Lewis pointed out, the *Munday*

18  case, it's out there, but it's kind of an aberration.

19  And generally --

20       THE COURT:  Well, the rule of completeness in

21  not an aberration.  That -- Ms. Goins acknowledged that

22  herself.

23       MR. FREELAND:  Well, certainly not.  But the

24  rule of completeness, if -- again, you know, the rule of

25  completeness, as I understand it, really would only

1  authorize the introduction of a statement where a
2  portion of it misleads the jury.  And there hasn't been
3  any showing that that has occurred here, that the rule
4  of completeness would require the introduction of the
5  entire statement because the jury was misled by what was
6  presented.
7          THE COURT:  And I don't mean to put anybody on
8  the spot.  But since I've confessed I didn't read
9  Detective Rockhill's cross-examination on rebuttal yet,
10 you may not have, either.
11         But do you recall whether Ms. Goins asked
12 Detective Rockhill on cross-examination a question such
13 as, well, didn't Mr. Barrett tell you this, in other
14 words, bringing out the fact that he was saying the same
15 thing that he testified earlier about?  And if you don't
16 know, that's fine.
17         MR. FREELAND:  I don't have a specific
18 recollection as to what -- every question that she asked
19 Detective Rockhill.  So we'll have to rely upon the
20 record as to what that says.
21         THE COURT:  Well, I think that's fair to
22 Mr. Barrett as well as fair to Mr. Goins, so --
23 Ms. Goins, excuse me.  The record speaks for itself.  It
24 makes no -- just for the purposes of our discussion
25 here, trying to get a bearing.

1          Let's talk about in the context of *Strickland*,

2     prejudice.  If there was deficient performance, and I'm

3     not suggesting there was, but if there was in failing to

4     bring out prior consistent statements, was Mr. Barrett

5     prejudiced?

6          And we can go in any order you want.  It

7     doesn't matter to me.  Mr. Freeland?

8          MR. HALL:  You're up there.

9          MR. FREELAND:  I don't see how he was

10     prejudiced.  I mean, the statements that he wanted to be

11     presented to the jury, the jury heard them.  They were

12     present.  Bringing in another witness --

13          THE COURT:  Well, the statements weren't --

14     the essence of what he said was present -- was admitted

15     because he testified.  But the statements may or may not

16     have been presented to the jury because nobody can

17     remember except, Mr. Barrett, of course.

18          MR. FREELAND:  Well, we're really only

19     talking -- we're only talking about, as my recollection,

20     only those four -- those four areas.  The issue of the

21     window, which I think everybody agreed was not really

22     relevant to this case.  And I think we looked back

23     through the reports, and the -- Detective Rockhill

24     stated that that's one of the reasons why he didn't

25     write that down in his report because -- I think it was

1    Detective Hayden who brought to his attention that this

2    window was broken out.  And Detective Rockhill stated

3    that he didn't write it down in his report because it

4    didn't seem to have anything to do with this case.

5          So how does that help the defendant?  I don't

6    see how that helps him at all one way or the other.  So

7    he was not prejudiced by that, by the existence or

8    non-existence of testimony about the window.

9          When we talk about the remainder of it, the

10   burn, you know, his -- his statement about being burned,

11   that is present.  The statement about whether he was

12   attacked or not, he told Detective Rockhill that he was

13   retreating from an attacking man.  The victim was

14   attacking him.  That clearly was before the jury and the

15   jury considered that.

16         Now, I mean, the inconsistent statements were

17   not really there, now.  The fact -- I mean, the fact

18   that he never told Detective Rockhill that the man

19   lunged at me, I think that's where he wants to bring

20   that in.

21         But the consistent statement that was brought

22   in, the man was attacking me and I defended myself, the

23   jury heard that.  And so was he prejudiced by not having

24   an additional witness come in to say that that's what he

25   told me?  I don't see how he was, how he could be.  He

```
 1    was allowed to present his self defense argument.  They

 2    argued it to the jury and the jury rejected it.  I think

 3    that's our position.

 4              THE COURT:  Mr. Hall?

 5              MR. HALL:  Judge, just briefly.  I certainly

 6    would argue that Mr. Barrett was prejudiced from the

 7    standpoint when we look at the case in context, someone

 8    who's much bigger than Mr. Barrett, Mr. Barrett

 9    retreats, he's followed.  It's not like we have a third

10    witness, fourth, etcetera, to testify as to what

11    happened.

12         The only way the jury is going to learn what

13    happened was between the decedent, unfortunately, and

14    Mr. Barrett.  And in this situation, when it's such a

15    close call -- and that's the reason why I wanted to

16    introduce the jury note because to me that's a very

17    powerful question.  We'd like to see his trial

18    testimony, I think is what the note said.

19         But I think it's really important when the jury

20    starts asking, well, hey, we'd like to see his testimony

21    to the police, his statements to the police, and that's

22    what the case revolves around.  And I certainly would

23    argue that he was prejudiced by the lack of completeness

24    of those statements being presented to the jury in this

25    case.
```

1          I definitely think in a close call it certainly

2     would have made a difference in this case as opposed to

3     it being a slam dunk.  And I don't think -- I don't

4     think it can be reasonably argued that this is a slam

5     dunk he wasn't prejudiced at all.  And I would argue

6     that he was prejudiced in this case.  And I think that's

7     shown by the record both today, the jury note, and in

8     the lower trial court testimony.

9          That's my argument to you, Judge Whittemore.  I

10    know Mr. Barrett is adamant about the Court looking at

11    *Munday*.  I think you cited it in your order.

12              THE COURT:  I've read *Munday*.

13              THE DEFENDANT:  I have another -- I have

14    another case.

15              THE COURT:  Well, you give it to Mr. Hall.

16              (Brief pause.)

17              MR. HALL:  Judge, he wants me to bring to your

18    attention *Mendoza versus State of Florida.*

19              THE COURT:  Say again, Mr. Hall.  I'm sorry.

20    I just didn't hear you.

21              MR. HALL:  *Mendoza*, M-e-n-d-o-z-a, *versus State

22    of Florida*, 700 So.2d 670.

23              THE COURT:  What court, please, and what year?

24              MR. HALL:  Florida Supreme Court.  And the

25    year, I'm sorry, is 1997.

1          THE COURT:  What does *Mendoza* say?

2          MR. HALL:  *Mendoza* talks about the rule of

3    completeness.  We've talked about it.  And I'm trying to

4    give you a pinpoint cite.  It's going to be pinpoint

5    cite 673, citing the evidence code, Florida Evidence

6    Code 90.108.  It's just talking about the rule of

7    completeness.

8          THE COURT:  I'll read the case.

9          MR. HALL:  Yes, sir.

10         THE COURT:  Well, counsel, I appreciate your

11   efforts.

12         Mr. Barrett, I hope you appreciate Mr. Hall's

13   efforts.  Stepping in in the middle of one of these

14   post-conviction matters is not an easy thing.

15         I'll rule when I rule.  I don't promise when.

16   Give me a chance to digest a lot of this.  And I'll have

17   to review some transcripts.

18         I'll have an order out by Monday on the

19   reconsideration, although I've already announced my

20   ruling on the record.  But I think that should be

21   documented in light of the *Johnson v. Williams* decision.

22         I do have another matter at 4:00, so we need

23   to clear out.  Thank you.  Thank you to the state for

24   your assistance in bringing Mr. Barrett here.

25              (Proceedings concluded at 3:50 PM.)

```
 1                 C E R T I F I C A T E

 2

 3   STATE OF FLORIDA          )

 4   COUNTY OF HILLSBOROUGH    )

 5       I, Linda Starr, RPR, Official Court Reporter for the

 6   United States District Court, Middle District, Tampa

 7   Division,

 8       DO HEREBY CERTIFY, that I was authorized to and did,

 9   through use of Computer Aided Transcription, report in

10   machine shorthand the proceedings and evidence in the

11   above-styled cause, as stated in the caption hereto, and

12   that the foregoing pages, numbered 1 through 108,

13   inclusive, constitute a true and correct transcription

14   of my machine shorthand report of said proceedings and

15   evidence.

16       IN WITNESS WHEREOF, I have hereunto set my hand in

17   the City of Tampa, County of Hillsborough, State of

18   Florida, this 15th day of January 2014.

19

20

21             /s/ Linda Starr
               Linda Starr, RPR
22

23

24

25
```